Producciones Tommy Muñiz, Inc., demandante y recurrente, *v.* Comité Organizador de los VIII Juegos Panamericanos (COPAN), demandado y recurrido; El Estado Libre Asociado de Puerto Rico, interventor y recurrido.

Número: R-79-169     Resuelto: 21 de mayo de 1979

*Rubén T. Nigaglioni,* abogado de la recurrente; *Wilfredo A. Géigel,* abogado del recurrido.

RESOLUCIÓN

A la Moción en Auxilio de Jurisdicción presentada por Producciones Tommy Muñiz, Inc., no ha lugar.

Lo acordó el Tribunal y certifica el Secretario. El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Rigau disienten. El Juez Asociado Señor Rigau emitió opinión disidente a la cual se une el Juez Presidente Señor Trías Monge. El Juez Asociado Señor Torres Rigual emitió voto particular. El Juez Asociado Señor Negrón García no intervino.

(Fdo.) Ernesto L. Chiesa

*Secretario*

—O—

Opinión disidente del Juez Asociado Señor Rigau a la que se une el Juez Presidente Señor Trías Monge.
San Juan, Puerto Rico, a 21 de mayo de 1979

I

Por siglos la sociedad puertorriqueña ha vivido bajo el imperio de la ley; ha vivido bajo el derecho civil, bajo cuya *aegis* se ha desarrollado la civilización de tres cuartas partes del mundo civilizado, desde las Doce Tablas (Siglo 5 A.C.) hasta nuestros días.

En la vida y desarrollo de esa civilización y de ese derecho dos elementos han sido de cardinal importancia en su función de base o soporte de toda la subsiguiente superestructura jurídica y moral de los mismos.

Uno de esos elementos cardinales es el de la buena fe, principio que no sólo es uno de los factores integrantes del derecho de obligaciones, sino de todo el orden jurídico, y el otro elemento está contenido en el binomio que preconiza que el contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o

prestar algún servicio y que los contratantes son libres de establecer los pactos y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público. Esa libertad de actuar y contratar, dentro de la ley, y esa confianza en que el prójimo actúa y contrata de buena fe son indispensables para la sociedad ordenada, pacífica y civilizada. Esas premisas de la vida civilizada las llamó Pound "the jural postulates of civilization." [1]

Cuando esa armonía moral y jurídica se quiebra corresponde al ordenamiento jurídico, a través de sus instituciones apropiadas, tomar las acciones remediales y correctivas necesarias. Si las instituciones llamadas a esa tarea abdican o rehuyen su función y su deber, se cae en la incertidumbre y en la anarquía jurídica y se invitan males peores. Según la eterna vigilancia es el precio de la libertad, la eterna disposición a sostener el Derecho y la Justicia constituye el precio de la paz social. El caso de autos es un ejemplo de esto último.

La demandante, Producciones Tommy Muñiz, Inc., es una corporación puertorriqueña organizada bajo las leyes de este país. Se dedica al negocio de producir espectáculos de radio y televisión.

El demandado, el Comité Organizador de los VIII Juegos Panamericanos (COPAN), es una corporación sin fines lucrativos también organizada bajo las leyes de Puerto Rico. Su objetivo inmediato es organizar, promover y transmitir lo concerniente a la celebración de los VIII Juegos Panamericanos. [2]

---

[1] Pound, III *Jurisprudence* 8, 10 (1959).

[2] Lo de fines no lucrativos es relativo. De las determinaciones de hecho de la ilustrada Sala sentenciadora surge lo siguiente. Mucho antes de iniciarse este caso, en el año 1977, una funcionaria del Departamento de Instrucción sugirió al Sr. Arturo Carrión, Presidente de COPAN, que cediese los derechos de transmisión de los VIII Juegos Panamericanos a las estaciones del Gobierno, a lo cual no accedió Carrión explicando que COPAN necesitaba recaudar fondos y que por ello no podía hacer esa concesión. Estaba implícita en la contestación de Carrión que COPAN se proponía vender por dinero los mencionados derechos. COPAN vendió los

COPAN está compuesto de 23 miembros. Cinco son miembros del Comité Olímpico de Puerto Rico, 13 son funcionarios públicos y los restantes 5 miembros son ciudadanos particulares. COPAN tiene un Comité Ejecutivo. El Sr. Arturo Carrión es el Presidente tanto de COPAN como del Comité Ejecutivo de COPAN.

COPAN tiene a su cargo el organizar, promover y dirigir los Juegos Panamericanos que están programados para celebrarse en San Juan de Puerto Rico del 1 al 15 de julio de 1979. A tales fines COPAN decidió vender los derechos para la transmisión por radio y televisión en Puerto Rico de los eventos y ceremonias de dichos Juegos Panamericanos. COPAN preparó la licitación y abrió el asunto a subasta. Se invitaron a varias firmas a participar en la misma y concurrieron la Puerto Rico Broadcasting, Inc. (WAPA–TV), la San Juan Pro Arts y Producciones Tommy Muñiz, Inc.

A tenor con las determinaciones de hecho de la ilustrada Sala sentenciadora el señor Muñiz, Presidente de Producciones Tommy Muñiz, Inc., envió al Sr. Arturo Carrión, Presidente de COPAN, el 3 de enero de 1979, la siguiente comunicación:

"Sirva la presente para ofrecer a nombre de Producciones Tommy Muñiz, Inc. y/o sus cesionarios la suma de doscientos mil dólares ($200,000) por los derechos exclusivos de radio y televisión para Puerto Rico para la transmisión de los Juegos Panamericanos que han de celebrarse en Puerto Rico durante el mes de julio de 1979.

Esta propuesta incluye la instalación por parte nuestra de un centro de televisión que estará dispuesto y será adecuado para negociar su uso con otros mercados."

Ese mismo mes, el 16 de enero de 1979, la Junta de Subastas le comunicó al señor Muñiz lo siguiente:

---

derechos para la transmisión de los Juegos a los Estados Unidos por la suma de $350,000. COPAN adjudicó la subasta a la firma de Producciones Tommy Muñiz, Inc., por $200,000 y más tarde le exigió $25,000 adicionales a lo cual tuvo que consentir dicha firma.

"Nos place informarles que el Comité Organizador de los VIII Juegos Panamericanos y su Junta de Subastas adjudicó a esa empresa la buena pro de la Subasta Núm. COPAN 79-01, Derechos de Televisión.

En breve se le someterán, para su firma, los documentos escritos ratificando los acuerdos entre ustedes y COPAN–79."

En esa misma fecha la Junta de Subastas de COPAN notificó a los otros dos licitadores, la Puerto Rico Broadcasting, Inc. (WAPA–TV) y San Juan Pro Arts lo siguiente:

"A nombre del Comité Organizador de los VIII Juegos Panamericanos y de su Junta de Subastas, deseo informarles que la Subasta Núm. COPAN 79-01, Derechos de Televisión, le fue otorgada a la Firma Tommy Muñiz Productions, Inc.

Deseamos expresarle nuestra más profunda satisfacción y agradecimiento por su interés y participación en la referida subasta."

Al ser citado Muñiz para la firma del contrato éste se percató, expresan las citadas determinaciones de hecho del tribunal de instancia, "de que el contrato contenía cláusulas que resultaban sumamente onerosas para Producciones Tommy Muñiz, Inc." y se reunieron para discutirlas los señores Muñiz y Arturo Carrión con sus respectivos asesores técnicos—Sres. Joe Díaz y Maurice Louvet—y sus asesores legales—Lcdos. Rubén Nigaglioni y Jaime Otero. Añaden dichas determinaciones de hecho que "El Sr. Maurice Louvet [asesor técnico de COPAN] estuvo de acuerdo con que el contrato que se le sometió al señor Muñiz incluía cláusulas sumamente onerosas."

Surgió de la prueba que Muñiz había entendido que el establecimiento del centro de televisión tendría como función la transmisión local de los Juegos, mientras que Carrión entendía que su función incluiría tanto la transmisión local como la internacional. La transmisión a los Estados Unidos estaba excluida tanto de la local como de la internacional porque COPAN había vendido los derechos para la transmisión en ese país por $350,000.

Sobre el asunto del establecimiento del centro de televisión para la transmisión internacional de los Juegos las partes acordaron la creación de una empresa común.

Encontró también probado el tribunal de instancia que en la reunión del 24 de enero de 1979 el Presidente de CO-PAN, refiriéndose al borrador de contrato expresó lo siguiente:

". . . El Comité Ejecutivo encontró este proyecto apropiado y solamente quedó pendiente la versión final que va a ser muy parecida a la versión actual."

En una reunión celebrada el 8 de febrero de 1979 Muñiz y Carrión acordaron que la empresa común para la transmisión internacional de los Juegos no se llevaría a cabo. COPAN exigió y Producciones Muñiz aceptó pagar una suma adicional de $25,000 a COPAN. Fue en esa reunión en la cual Carrión le manifestó a Muñiz "que tenía un contrato y siguiera adelante."

El 27 de febrero de 1979 el Hon. Luis Ayala del Valle le cursó una comunicación a Carrión manifestando su interés por la transmisión local de los Juegos. En contestación a esa comunicación Carrión se expresó como sigue:

". . . Por tal motivo pedimos propuestas a productores y canales de televisión, recibiendo finalmente tres, de las cuales escogimos la de Tommy Muñiz Productions, Inc. Esta es superior tanto en el aspecto económico como en el horario y número de deportes a transmitirse. Por poseer un canal de televisión Tommy Muñiz Productions dispone del tiempo que las otras estaciones tienen ya comprometido comercialmente. Esto le permitirá más horas de transmisión cosa que conviene al deporte puertorriqueño. Desde el 5 de enero hemos negociado las condiciones y cláusulas del proyecto del contrato que se preparó al efecto."

Continuaban las reuniones y el Presidente de COPAN no firmaba el contrato. Pasaba el tiempo, acortándose así peligrosamente el plazo de que disponía Muñiz, concesionario de

la subasta, para planificar y ejecutar los innumerables actos, contratos, compra y alquiler de equipo, contratación de técnicos, mejoramiento de la señal, etc., todo ello a realizarse antes de julio de 1979, cuando se celebrarían los Juegos. Muñiz obtuvo una fianza de $200,000 para garantizar a COPAN el pago de los derechos para la transmisión por radio y televisión en Puerto Rico de los Juegos.

A tenor con las citadas determinaciones de hecho, el 4 de marzo de 1979 Carrión le comunicó a Muñiz que "por instrucciones del Gobernador de Puerto Rico el contrato entre COPAN y Producciones Tommy Muñiz, Inc. no se firmaría." Añade el tribunal de instancia: "este Tribunal le da entero crédito al testimonio del señor Muñiz." A los 10 días, el 14 de marzo la Dra. Elsie Calero de Martínez, Administradora General del Servicio de Radio y Televisión del Departamento de Instrucción Pública, sometió al Secretario de Instrucción un plan para la transmisión de los Juegos por las estaciones del Gobierno.

En 20 de marzo el Comité Ejecutivo de COPAN aprobó una moción autorizando a Carrión a comenzar negociaciones formales con el Departamento de Instrucción Pública sobre la transmisión de los Juegos y suspendiendo las negociaciones con la firma Producciones Tommy Muñiz, Inc. Añade la Sala sentenciadora lo siguiente:

"Es menester señalar que el Vice-presidente de COPAN, Sr. Carlos Garret, llevó redactado un borrador que contenía básicamente la moción que posteriormente se aprobó."

Continúa expresando el tribunal de instancia en sus determinaciones de hecho lo siguiente:

"Horas antes de que el Secretario del Comité Ejecutivo certificara la resolución adoptada por el Comité, el Honorable Gobernador de Puerto Rico, Carlos Romero Barceló, celebró una conferencia de prensa entre 12:00 y 1:00 de la tarde del 21 de marzo donde informó que los Octavos Juegos Panamericanos se transmitirían por las emisoras del pueblo de Puerto Rico."

También concluyó el tribunal de instancia:

"A partir del 16 de enero de 1979 el Sr. Tommy Muñiz realizó innumerables gestiones encaminadas a la preparación de la transmisión de los Juegos: sostuvo conversaciones con técnicos en el área de la producción y transmisión televisada y radial, realizó viajes, consultó con abogados, y conversó con firmas que se dedican a la venta y alquiler del equipo necesario para realizar este tipo de transmisión.

Resulta claro para este Tribunal que el señor Muñiz dedicó mucho tiempo y esfuerzo en las gestiones necesarias para lograr una buena producción y transmisión de los Juegos Panamericanos."

Concluyó también el tribunal de instancia que con anterioridad a los hechos relatados la Dra. Calero de Martínez le había indicado a Carrión su deseo de que los Juegos Panamericanos se transmitiesen por las emisoras del Gobierno de Puerto Rico y que Carrión le había contestado que no se podía hacer esa concesión a las estaciones del pueblo de Puerto Rico porque COPAN necesitaba recaudar fondos. Es clara la implicación de que COPAN siempre tuvo en mente vender esos derechos por dinero y no cederlos a las estaciones del Gobierno.

El demandado y el interventor presentaron prueba tendente a demostrar que los Canales 6 y 3 eran superiores al que opera la firma de Muñiz, a lo cual el tribunal de instancia contestó que era irrazonable pretender que fuese el tribunal el que hiciese la determinación técnica de qué canal estaba mejor preparado para hacer esas transmisiones, cuando esa determinación correspondía hacerla a COPAN quien tenía el deber y la función de organizar, dirigir y proveer para la transmisión de los Juegos. Esa, la fase técnica, era una de las condiciones que formaban parte del cuadro de valores al momento de concederse la subasta, subasta que COPAN concedió a la firma de Muñiz.

Al así hacerlo, como hemos señalado antes, el Presidente de COPAN había expresado que escogieron la propuesta de

Muñiz por ser la superior no sólo en el aspecto económico, sino en el horario, en el número de deportes a transmitirse, por poseer un canal de televisión propio, por disponer de más horas de transmisión, etc. Como se sabe, al otorgarse una subasta no solamente se considera el factor económico sino todos esos otros factores concomitantes, de calidad del producto o del servicio, de seguridad, de confiabilidad, etc. que ofrecen los licitadores, son factores que se toman en cuenta.

Añadió el tribunal de instancia que COPAN "nunca ha realizado estudio alguno del alcance de la transmisión de cualquiera de los canales de televisión de Puerto Rico."

Señala el tribunal de instancia que Carrión, con el conocimiento y anuencia del Comité Ejecutivo y del Comité Organizador, estuvo negociando con Muñiz hasta el 14 de marzo de 1979, cuando le notificó que no podía formalizarse el contrato sin aducir razones válidas para ello. Más adelante a la página 22 de su Opinión y Sentencia la Sala sentenciadora se expresa como sigue:

"La parte demandada sostiene que no se celebró una subasta. Nos sorprende la posición acomodaticia del presidente de COPAN. Para unos propósitos reconoce que se celebró una subasta y para otros lo niega. El 24 de enero de 1979 ante el Comité Organizador reconoció la celebración y adjudicación de la subasta.

Ante este Tribunal pretende negar la celebración y adjudicación de la subasta aduciendo además que aunque tenía la facultad para seleccionar el productor que realizaría la transmisión local de los Juegos decidió referir el asunto a la Junta de Subastas para 'evitar la crítica que pudiera recaer sobre su persona' si él realizaba la selección.

No podemos reconocer la validez de la posición del señor Carrión al aceptar la celebración de la subasta para aquellos fines que son de su conveniencia y negarla para aquello que le perjudica a COPAN."

Añade el tribunal que el Comité Organizador, con la presencia de sus 23 miembros, aceptó el informe de su Presidente en donde se expresaba lo siguiente:

"Se han recibido unas propuestas, después de un sinnúmero de reuniones. La Junta de Subastas le otorgó la subasta al mejor postor que fue la firma de Tommy Muñiz Productions, Inc. Esta firma ofrece producir la señal de televisión localmente, que es de un costo bastante alto y además ofrece la cantidad de $200,000 en efectivo. Parte del Centro de Televisión nos permite a nosotros, con una aportación de COPAN, vender esa señal para otros países. El Comité Ejecutivo encontró este proyecto apropiado y solamente quedó pendiente la versión final que va a ser muy parecida a la versión actual."

Expresa el tribunal:

"Entendemos que el Sr. Tommy Muñiz fue sorprendido en su buena fe y que las actuaciones de la parte demandada y su Comité Ejecutivo han sido arbitrarias y caprichosas. Nos preocupa que ante este Tribunal haya comparecido COPAN a tratar de demostrar que el Canal 7 no puede ofrecer una buena transmisión de los Juegos Panamericanos, mientras que los Canales 6 y 3 sí pueden ofrecerla.

Ante esas circunstancias cabe preguntarnos: ¿Por qué el Comité Ejecutivo esperó hasta el 20 de marzo de 1979 para considerar que la transmisión se hiciese por las emisoras del Pueblo de Puerto Rico? ¿Por qué esperó para tomar tal determinación luego de que su presidente, Arturo Carrión, con su consentimiento y anuencia, estuviera negociando con el Sr. Tommy Muñiz durante varios meses?"

Concluye el tribunal expresando que:

"De un análisis de la prueba desfilada surge que COPAN al suspender las negociaciones no actuó de buena fe por lo que debe responder por los daños y gastos ocasionados a la parte demandante."

## II

A pesar de lo anterior, la Sala sentenciadora concluyó que no se había celebrado un contrato entre COPAN y Producciones Tommy Muñiz, Inc., pero que debido a la conducta engañosa y de mala fe de COPAN, Producciones Tommy Muñiz, Inc., tenía derecho a ser compensada por los daños sufridos y por los gastos ocasionados.

Entendió la Sala sentenciadora que porque hubo negociaciones posteriores a la adjudicación de la subasta sobre una serie de detalles, no existía contrato a la fecha en que el Presidente de COPAN le informó a Muñiz que no firmaría.

En su solicitud de revisión la recurrente Producciones Tommy Muñiz, Inc., plantea dos señalamientos de error, los cuales pueden resumirse en uno. Señala que erró el tribunal de instancia al concluir que no existía un contrato entre la demandante y COPAN.

El error se cometió. Como se sabe, para que exista contrato deben concurrir los siguientes tres requisitos: El consentimiento de los contratantes, objeto cierto que sea materia del contrato y causa de la obligación que se establezca. Art. 1213 del Código Civil. Una vez que concurran las condiciones esenciales para su validez, los contratos son obligatorios para las partes, Art. 1230 Código Civil, y, desde luego, la validez y el cumplimiento de los contratos no pueden dejarse al arbitrio de uno de los contratantes, Art. 1208 Código Civil. El consentimiento se manifiesta por el concurso de la oferta y de la aceptación sobre la cosa y la causa que han de constituir el contrato. Art. 1214 Código Civil.

En el caso de autos no hay duda de que concurrieron los tres requisitos esenciales para la formación del contrato. Se realizó el consentimiento cuando, luego de expedir la licitación, COPAN aceptó la propuesta de la demandante recurrente. En ese momento ocurrió el concurso de la oferta y la aceptación que requiere el Art. 1214 del Código Civil antes citado. Abundando en la realización de dicho consentimiento y haciéndolo más formal, COPAN notificó por escrito a la recurrente que le había adjudicado la subasta y también notificó ese hecho por escrito a los otros dos licitadores a quienes no se les adjudicó la subasta.

Los otros dos requisitos de objeto cierto, materia del contrato y causa de la obligación, también estaban presentes. Se trataba de la transmisión de los Juegos y del precio que la

recurrente ofreció por dichos derechos y que la demandada aceptó.

Expresa lo siguiente Don José Puig Brutau en *Fundamentos de Derecho Civil*, Tomo II, Vol. I, 2da. ed. (1978), pág. 184:

"Un caso claro de invitación a formular ofertas aparece en la contratación por pública subasta. *El contrato se forma por subasta,* dice Diez-Picazo, 'cuando, por voluntad de uno de los contratantes, se establece que el contrato quedará celebrado y perfeccionado con el mejor postor y en las condiciones resultantes de la mejor postura ofrecida en una licitación practicada en todos los interesados en contratar . . . .'

*Puesto que mediante la subasta se celebra un contrato,* hay que preguntar si la oferta es el anuncio de subasta o lo es la licitación o postura de los que pretenden la adquisición. Pero, en realidad, dice el autor citado, el mecanismo de la subasta constituye un medio autónomo de contratación que se desenvuelve con el anuncio de subasta, la licitación o manifestación de las posturas y el remate o adjudicación. *El anuncio no es una mera invitación* para que los interesados formulen ofertas. *El anuncio no sólo provoca la subasta, sino que además establece las reglas que vinculan al anunciante. Contiene, además, el proyecto de contrato,* en el que solo faltan las circunstancias que ha de proporcionar la subasta. Los licitadores o postores emiten una declaración de voluntad contractual al participar en la subasta y al hacer las diferentes posturas. *El contrato queda perfeccionado al hacerse la mejor postura o al hacerse la proposición más ventajosa. El remate o adjudicación confirma o ratifica la celebración y perfección del contrato.* Pero en las subastas voluntarias, el anunciante puede reservarse expresamente el derecho de aprobar el remate . . . y en este caso la aprobación deja perfeccionado el contrato." (Bastardillas nuestras.)

Así lo aceptó este Tribunal cuando en *Cancel v. Municipio de San Juan,* 101 D.P.R. 296, 299 (1973), expresamos:

"Generalmente la adjudicación de la buena pro a un licitador por la Junta de Subastas ata al Municipio en una relación con-

tractual con el adjudicatorio que no puede ser resuelta unilateral o arbitrariamente." (³)

El hecho de que luego de otorgada la subasta COPAN tratase de hacerle modificaciones al contrato no anula ni destruye el contrato ya celebrado y que le obligaba. Si se trataba de detalles que era necesario precisar, la culpa de que no estuviesen en el contrato fue de COPAN pues fue ella quien preparó la oferta de subasta. No puede imputarle al licitador defectos en el pliego de subasta que él no redactó. Y si se trataba de hacerle enmiendas al contrato que COPAN estimaba necesarias o convenientes, era lícito que las partes conversaran y negociaran sobre esos particulares.

Después de todo, como se sabe, las enmiendas a un contrato celebrado no pueden hacerse unilateralmente, sino por acuerdo de las partes contratantes. Esas conversaciones y negociaciones no destruyeron en absoluto el vínculo contractual que mediante el otorgamiento de la subasta ya ataba a la concurrente y a la demandada.

Realmente, como lo encontró probado la Sala sentenciadora, lo que los hechos rezuman es que desde algún momento COPAN comenzó a tratar este asunto con mala fe, dándole largas al mismo, colocándose así fuera de los supuestos y de los preceptos de la ley y dentro del terreno de la culpa y de la responsabilidad. En cuanto a ese extremo el tribunal sentenciador vio claro. Donde erró fue en entender que no había habido contrato. Como hemos expresado estamos convencidos de que hubo contrato y de que COPAN lo violó.

Tardíamente y con escaso valor persuasivo COPAN y el Departamento de Instrucción tratan de enarbolar la bandera

---

(³) En ese caso de *Cancel* se llegó a otra conclusión debido a una situación especial de sus hechos. Condición esencial de la subasta era la prestación de una fianza por parte del licitador y el Tribunal encontró que dicha fianza fue puesta en cuarentena y desnaturalizada, dejando sin protección alguna al Municipio. Luego, allí no se cumplió ese requisito del contrato de subasta. En el caso de autos se cumplió. COPAN exigió y el recurrente prestó una fianza de $200,000.

del interés público. Parecen olvidar que, como señala Boden-heimer, el interés público para ser genuino requiere un alto contenido de honradez y de juego limpio. [4]

Como señala el distinguido jurista español Don Antonio Hernández Gil en el derecho de obligaciones las normas morales dominan, siendo preciso que las partes las respeten. La obligación civil no es una mera relación entre dos patrimonios sino que descansa en un deber moral y es preciso que la regla jurídica organice técnicamente su cumplimiento. [5]

Como dijo el Ex-Juez Presidente del Tribunal Supremo de los Estados Unidos Earl Warren "In civilized life, law floats in a sea of ethics. . . . Where there is no ethical commitment to observe the law, the judicial and police systems are really helpless, and law often ceases to operate at all." [6]

Por todo lo anterior, yo declararía con lugar la demanda y mediante la Regla 50 del Reglamento de este Tribunal ordenaría el cumplimiento específico del contrato, según lo solicitan los demandantes en su Moción de 15 de mayo de 1979 y el pago por la parte demandada a la demandante de los daños ocasionádoles.

—O—

Voto particular del Juez Asociado Señor Torres Rigual.

San Juan, Puerto Rico, a 22 de mayo de 1979

He votado en contra de la moción de auxilio de jurisdicción presentada por la recurrente Producciones Tommy Muñiz, Inc., porque su petición a este Tribunal en el recurso de revisión no es para obtener el cumplimiento específico del contrato para la trasmisión de los Juegos Panamericanos sino para el resarcimiento de daños. A esos efectos claramente ex-

---

[4] *Jurisprudence, The Philosophy and Method of the Law,* Harvard University Press (1962) pág. 315 *in fine.*

[5] *Metodología del Derecho,* Editorial Revista de Derecho Privado, Madrid (1945), pág. 31.

[6] Simon, *In His Own Image* (1973), pág. 73.

presó en su solicitud que su derecho a trasmitir las ceremonias y eventos de los Juegos Panamericanos se había tornado "... casi en ilusorio, posiblemente académico y ciertamente en imposible como originalmente se concibió, ...." por las actuaciones culposas y de mala fe cometidas por la recurrida COPAN. Más específicamente, en la Súplica de su recurso se limitó a solicitar que se decretara la existencia de su derecho a obtener un resarcimiento en daños.

Habiendo este Tribunal expedido el auto solicitado por Producciones Tommy Muñiz, Inc. para determinar el derecho al resarcimiento de daños por incumplimiento de contrato resulta insólito e inoportuno cualquier expresión sobre los méritos de esta cuestión en estos momentos.