**MARIO R. FRANCESCHINI, INC., Plaintiff,**

v.

**The RILEY COMPANY, Defendant.**

**Civ. No. 83–0917CC.**

United States District Court, D. Puerto Rico.

July 11, 1984.

A.J. Amadeo-Murga, Hato Rey, P.R., for plaintiff.

Edgardo Cartagena-Santiago, O'Neill & Borges, Hato Rey, P.R., for defendant.

OPINION AND ORDER

CEREZO, District Judge.

This diversity case was removed from the Superior Court of Puerto Rico pursuant to 28 U.S.C. Sec. 1441(a). This federal court is again called upon to construe Puerto Rico's Act No. 75 of June 24, 1964, *P.R.Laws Ann.* Tit. 10 Sec. 278, *et seq.* also known as the Dealer's Act. We must determine whether the relationship between plaintiff Mario Franceschini, Inc. and defendant The Riley Company falls within the Act's definition of "dealer" and "dealer's contract." The matter has been raised in defendant's motion for summary judgment and in plaintiff's opposition. Adopting as true the uncontroverted facts relied on by defendant and granting in plaintiff's favor all those that remain challenged or which have been duly controverted, as well as all favorable inferences that may be derived therefrom, *see:* R. 56, Fed.R.Civ.P., the factual context of the commercial relationship between the parties can be described as follows.

Plaintiff is a Puerto Rico based enterprise dedicated to the sale and representation of various products of different mainland firms. It represented defendant's "Panalarm" line of products from 1965 until 1980 when their contractual relationship was terminated. During that span of time its activities consisted of visiting potential

clients to inform them of defendant's products, advertising in local trade publications and shows, hiring employees with an engineering background and sending them to stateside training to enable them to understand the product's technical features, sending information by mail to customers and forwarding some orders to defendant. It did not buy equipment or spare parts from defendant nor did it keep any inventory or warehouse facilities. It neither set prices or terms on the sale nor did it extend credit or engage in billing or collection efforts. According to the Sales Representative Agreement, plaintiff would earn a commission once the purchase order had been received and approved in writing by defendant. The Agreement provided that all orders obtained by plaintiff or its employees were subject to formal acceptance by defendant.[1] It specified that plaintiff was not an employee of Riley but rather an independent contractor for whose acts Riley was not to be held liable and who had to carry workmen's compensation insurance for its employees.

Defendant's role in this relationship consisted in delivering, billing and servicing the product directly to the client once an order, sent either via plaintiff or directly by the client, was approved. Although plaintiff would sometimes provide routine consultation, installation or troubleshooting of defendant's equipment, all repairs were handled directly by defendant either by repairing or replacing the parts or by sending an authorized representative. Defendant was also in charge of all collection efforts of delinquent or credit accounts. In terms of promotion, there were clients in Puerto Rico who were first contacted by defendant through its promotion in the mainland. This mainly consisted of advertising in national publications and approaching the parent or affiliate corporations of Puerto Rico based clients. Riley would also provide plaintiff with mailing lists of these and other potential clients. Sometimes it would process orders directly from these clients.

It also advertised its products in Puerto Rico through seminars and sales representations and indirectly in publications which circulated in Puerto Rico. Costs of these promotional efforts, as well as all those related to the servicing, billing and credit involved in the sale, were borne by defendant. Thus, plaintiff's activities essentially involved some promotion and the development of a minor market for defendant's products in Puerto Rico but no actual control over the end result of its promotional efforts.

Defendant's position is that the mere promotion of a product is not enough to cast one as a dealer under Act 75. It argues that the strict requirements of the Act and its generous compensation provisions cannot be construed to apply to those who do not assume the risks generally associated with activities inherent to a dealer's handling of a product or service, namely: maintaining an inventory, providing warehouse facilities and assuming responsibility for billing, delivery, shipping and credit accounting. Plaintiff understands that, pursuant to the statute and its caselaw, the crucial inquiry in determining whether one is a dealer consists in deciding whether a new market was created for the principal's products or services regardless of whether one had the authority to actually sell the product or service represented.

The Act defines dealer as one who is: "actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service." A dealer's contract is defined as a:

Relationship established between a dealer and a principal or grantor whereby and irrespectively of the manner in which the parties may call, characterize or execute such relationship, the former actually and effectively takes charge of the distribution of a merchandise, or of the

1. "V.B. *Acceptance of Orders*
    1. No order obtained by Sales Representative, or any of his sub-representatives or employees, shall be binding upon Riley, until the same shall be formally accepted by it in writing at its office in Skokie, Illinois."

rendering of a service, by concession or franchise, on the market of Puerto Rico. *P.R.Laws Ann.* Tit. 10 Sec. 278(a), (b). The scant legislative history of the statute refers solely to the problems faced by dealers in Puerto Rico who created a favorable market for a principal's product only to have the relationship arbitrarily terminated at will. It does not explore the scope of the definitions. Through the years, however, the Supreme Court of Puerto Rico has provided guidelines in its interpretation of the Act. In *San Juan Mercantile Corp. v. Canadian Transport Co., Ltd.,* 8 *P.R. Supreme Court Official Translations,* p. 218, 108 DPR 134 (1978), where the Court referred to the "very sketchy definition" provided by the Act for the terms dealer and dealer's contract, it said:

> [t]he dealer is basically characterized by his endeavors to create a favorable market and to draw customers to a product or service by promoting and closing sales contract. His work generally includes the activities necessary for the transportation of the products or services he represents from the manufacturer to the consumer or to some point in between.... Publicity, market coordination, merchandise deliveries, collections, the keeping of an inventory, and mainly *the promotion and closing of sales contracts* are, in general terms, obligations of the dealer. (Citations omitted, emphasis supplied.)

*Id.* at 220–221. It restated that the creation of a market and the winning of clients are the factors that trigger the indemnization provided by the Act if termination of the dealership is shown to be without just cause. Consistent with that reasoning it held that the services rendered by San Juan Mercantile Corp., consisting of providing defendant's ships with all necessary arrangements for unloading and delivering cargo, did not constitute a dealership for no market was generated by these activities. The court expressed that its construction of the scope of these terms would serve to complement the related discussion of them in *J. Soler Motors v. Kaiser Jeep Int'l.,* 8 *P.R. Supreme Court Official*

*Translations,* p. 138, 108 DPR 134 (1978). However, what was deemed "sketchy" in *San Juan Mercantile* was construed as "ample and encompassing" definitions in *Kaiser Jeep.* Upon reviewing the general characteristics of a commercial distributorship agreement it said:

> The different stages comprised within the process of transferring goods from the manufacturer to the consumer are integrated by several middlemen. These middlemen may be classified in different ways: wholesalers, dealers, retailers, franchised dealers, exclusive representatives, etc. The distribution process includes them all, the first middleman or distributor, as well as the retailer who sells the product to the consumer. The distribution chain can also be divided into areas or regions, and each of its levels can be integrated by one or more middlemen....
>
> Act No. 75, *supra,* has the purpose of protecting the Puerto Rican intermediaries who represent a product or a service in the different levels of the distribution chain. To this respect, art. 1 of said law defines in ample and encompassing terms the concepts of "dealer" and "dealer's contracts"....

*Kaiser Jeep, Translations supra* at 142, 143. It recognized J. Soler Motors, Inc., an automobile retail sales concessionaire in an area of Puerto Rico, as a dealer within the meaning of the Act because:

> It would not be consistent with the purposes of Act No. 75, nor with its very text, to exclude from its protection concessionaires that, as J. Soler Motors, Inc., have maintained a commercial relation with appellee which is characterized by its continuity, stability, mutual trust, coordination between both parties as independent entrepreneurs, devoid of hierarchical subordination, and in whom appellee has made a substantial investment. All of these are distinctive elements of agencies' contracts. See: III–1 Garriguez, *Tratado de Derecho Mercantil,* at 536 (1963).

*Id.* at 145. In *Córdova & Simonpietri Insurance Agency v. Crown American Insurance Company*, 112 DPR 797 (1982)[2] via certification, the Supreme Court of Puerto Rico confronted the question whether Act 75 applied to Puerto Rico based insurance agents. Having preliminarily found that there was no conflict between Puerto Rico's Insurance Code and Act 75, it went on to examine the description of an insurance agent's activities as set out in the Insurance Code[3] and determined that an agent's primary task lies in "selling insurance policies; that is, in promoting and concluding insurance contracts for the benefit of the insurance company." 112 DPR at 803 (our translation). It concluded that "the insurance agent's commercial activity, inasmuch as it promotes and concludes insurance contracts, constitutes the rendering of a service through a concession or franchise in the Puerto Rican market under the Dealer's Contract Law." *Id.* (Our translation.)

Our court has also explored the scope of these definitions. In *Cruz Ramos v. Brother International Corp.*, 445 F.Supp. 983 (DPR) *aff'd.* 558 F.2d 817 (1st Cir. 1978), it examined the terms dealer and dealer's contract, as defined by the Act, against the factual context of the contractual relationship between the parties and concluded that plaintiff was not "actually and effectively" in charge of the distribution of defendant's products in Puerto Rico because he had no obligation to purchase inventories, had no warehouse facilities, employed no salesman "nor had any of the inherent responsibilities of a distributor" *id.* at 984. In that case defendant had a

warehouse in Puerto Rico and sold and distributed its products through its own company salesmen. However, it also employed sales representatives assigned to particular territories or to act as account representatives, one of which was Cruz Ramos. The Court held that he was merely a commissioned salesman, not entitled to the "severe provisions" of the Act. This holding was partially based on an opinion issued by the Superior Court of Puerto Rico, San Juan Part,[4] that held that an individual who merely obtained purchase orders for a manufacturing firm and forwarded them to the firm for approval was not a dealer within the meaning of the Act. *Id.* at 985. More recently, in *Sudouest Import Sales Corp. v. Union Carbide Corp.*, 569 F.Supp. 1547 (D.P.R.1983) *affirmed*, 732 F.2d 14 (1st Cir., 1984) this court again resolved the issue against plaintiff. The court found that plaintiff's activities consisted of soliciting orders for Union Carbide Corp. among customers and potential clients in Puerto Rico and submitting them to its principal for approval, billing and delivery. It emphasized that Sudouest did not keep an inventory, had no authority to fix prices, terms and conditions of sales, assumed no risk for credit sales and, thus, was not "effectively in charge of the distribution of the merchandise in Puerto Rico to be entitled to the protection of the Act." *Id.* at 1551. Our Circuit, aware of the Commonwealth court's interpretation of the statute, recognized the creation of a market for the principal's products as crucial criteria in making an Act 75 determination on the nature of the contractual relationship. It concluded, citing San Juan Mercantile,[5] that

2. Official translation pending.

3. *P.R.Laws Ann.* Tit. 26 Sec. 901 defines agent as: "an individual, firm or corporation appointed by an insurer to solicit applications for insurance or negotiate insurance on its behalf and if authorized so to do by the insurer, to effectuate and countersign insurance contracts."

4. *Frank Munarriz v. Captain Sylvain Ledee, Inc.*, Civ. 67–5799(904) September 14, 1977; appeal dismissed by the Supreme Court on December 20, 1977 for failure to present any substantial constitutional question.

5. We note for purpose of clarity that there appears to be a typographical error in the Circuit Court's citation of *San Juan Mercantile's* definition of dealer. Our copy of the slip opinion of *Sudouest* cites *San Juan Mercantile* as stating that "the Commonwealth Supreme Court has said that a dealer protected by Act 75 is 'one who endeavors to create a favorable market and to draw customers to a product or service by promoting *or* closing sales contracts." Slip Op. at 4 (emphasis supplied). However, the official translation of the Commonwealth opinion refers to "promoting *and* closing sales contracts." Ordinarily, we would not devote any time to

the facts did not show sufficient endeavors to create a market or to get new clients as to bring Sudouest within the Act and had shown no other ordinary "trappings" of a dealership to account for that omission.

The question before us, however, is whether the creation of a market, albeit small,[6] is enough to grant a business promoter the status of an Act 75 dealer, without evidence of the other usual trappings that are found in a dealership situation. A review of the factors set forth by the Supreme Court in the cases interpreting the terms "dealer" and "dealer's contract" leads to the conclusion that in order for one to be considered an Act 75 dealer one has to develop a market for a product or a service through promotion and closing of sales contracts. Regardless of the size of the inventory, of whether one rents or owns a warehouse, hires many or few employees or how the contractual relationship is designated, the ultimate matter to be determined is whether all activities performed, be they warehousing, delivery, advertising, add up to the development of a market through promotion and closing of sales contracts. If there is no indication that a market was developed and that to do so the party engaged in promotion efforts as well as in the closing of the sales contracts it promoted, then we do not have a relationship protected by the Act. In *San Juan Mercantile*, the dealer is clearly portrayed as one who engages in the promotion and closing of sales contracts. In *Kaiser Jeep* the facts reveal that plaintiff created a market by promotion and conclusion of sales contracts through its retail sale of automobiles in a specific territory. These two cases, read together, reveal that the Act does not apply to just anyone who comes in contact with a product or service in its route from manufacturer to consumer. If it did, shippers, carriers, custom brokers, husbandry agents, promoters, advertising agents and many others far removed from the distribution process would be covered. Thus, a promoter or advertising agent could claim Act 75 protection on the grounds that he generated a market for a given product simply by conducting a publicity campaign. Likewise a broker could claim dealer status because it promoted the sale of a product or service by placing the potential buyer in contact with the potential seller. These and many other persons or entities could claim the protection of Act 75 without being "effectively in .... charge" of the distribution of a product or service. That is not to say that one who calls himself an agent or broker may never be considered an Act 75 dealer. In view of the multiple forms that business and contractual dealings may take, disputes arising therefrom cannot be solved by placing tags on the relationship without applying the specific criteria set forth by the Supreme Court of Puerto Rico. Without following these guidelines, one would become entangled, upon exploring the Act's reach, in reconciling the myriad categories of business arrangements with the diverse nomenclature used in the world of commerce to refer to these different types of arrangements. *See gen.: Black's Law Dictionary* at pp. 58, 59, 174, 175, 247, 359, 383, 532, 890, 894 (5th Ed.); H. Johannsen & G. Terry, *The International Dictionary of Business*, at pp. 14, 68, 98, 105, 127, 218, 219, 318, 356 (1981); for the civil law versions of some of these commercial arrangements *see:* IV, J. Castán Tobeñas, *Derecho Civil Español Común y Foral*, pp. 538–549 (brokerage) (10th Edition). Tome III, Vol. 1 J. Garrigues, *Tratado de Derecho Mercantil*, pp. 449–528 (commission sales), pp. 529–578 (agency), pp. 579–603 (brokerage). For example, a general mercantile agent, also known as a commercial agent, Johannsen, *supra*, at 218, is considered as

such minor errors if they were of no consequence. However, in this case the "and/or" choice makes a significant difference.

**6.** The *Sudouest* decision does not suggest that the applicability of Act 75 will depend on the size of the market created. Such a construction could result in depriving those most in need of the Act's protection, namely small dealers or dealers without much capital to invest in extensive advertising campaigns. The *Sudouest* opinion made it clear that plaintiff did not prove that it found *any* new clients. Slip Op. at 6.

one entrusted with the custody of goods for their sale on behalf of a principal or manufacturer who remains the owner of the products until sold to a third party. *Id., Black's, supra,* at 59. However, this agency may take on a variety of forms depending on the arrangement made. The agent may agree on a *del credere* clause whereby it will act as surety to the principal guaranteeing the third party's payment. *Black's, supra* at 58, 383. Johannsen, *supra,* at 98. The agent could also be referred to as a factor or commission agent or commission merchant, generally conceived as one who sells goods for the benefit of another but in its own name and without having legal ownership of the object sold. *Black's, supra,* at 59, 532, Johannsen, *supra,* at 127. At other times the representation elements of an agency will be diffused and the arrangement conceived as a brokerage. Under such an arrangement the broker or merchandise broker arranges the sale by acting as a mere intermediary between the prospective parties without having custody over the object of the contract and without having the authority to deal in his own name. *Black's, supra,* at 175, 532; Castán, *supra, see gen* on brokerage: *Torres v. Arbona, Jr.,* 72 P.R.R. 719, 725–728 (1951). On the other hand, a wholesaler or dealer is generally conceived as one who buys from the producer or manufacturer to sell to the retailer. Johannsen, *supra,* at 219; *Black's, supra,* at 359, whereas a distributor is considered a special type of dealer to whom a manufacturer has granted an exclusive or preferential right in a particular market or geographical area. Johannsen, *supra,* at 105. Often dealers are referred to as merchants, traders, middlemen or simply agents. Johannsen, *supra,* at 218–219; *Black's, supra,* at 890. In *Balasquide v. Guilhon & Bathelemy,* 60 P.R.R. 334 (1942), decided more than two decades before Act 75, the Supreme Court of the Commonwealth emphasized the difference in terminology associated with such commercial relationships stating:

A sales agent or factor is one who sells goods which another person has delivered to him for that purpose and receives compensation for the services by commission or otherwise. If the so-called 'sales agent' buys and sells goods of another person on his own account, then he is not such sales agent. The essence of the sales agency is the delivery of the goods to the person who must sell the same, not as his own property, but as property of his principal, *who continues to own the goods and is entitled to control the sales, to fix prices and terms, and to demand and receive the purchase price less the agent's commission.* (Citations omitted; emphasis ours.)

*Id.,* at 341. And yet, curiously enough, the Act 75 dealer is often incorrectly referred to as an agent. *See: P.R.Laws Ann.* Tit. 10 Sec. 278(a); *San Juan Mercantile Corp.,* 108 D.P.R. 134 (1978); *Kaiser Jeep Int'l.,* 108 D.P.R. 134 (1978); Estrella, *El Contrato de Agencia o Representación Comercial,* 31 Rev.C.Abo.P.R. 241 (1970). Undoubtedly, a dealership may sometimes have some of the characteristics of an agency but it is unwise to classify it as such for an Act 75 distributor is not a mere agent of the principal but acts on its own with full ownership of the goods sold. It seems the Legislature of Puerto Rico was aware of the possibility of confusion caused by terminological niceties for it expressly provided that the determination of whether a particular relationship falls within the scope of Act 75 must be based on statutory definitions and not on the parties' choice of nomenclature in designating their agreements. *P.R.Laws Ann.* Tit. 10 Sec. 278(b). In light of the Supreme Court's construction of these definitions we understand that an Act 75 dealer does not conform squarely with general notions of a distributor or agency relationship but rather draws its configuration from various sources to form a unique commercial relationship. We must not look for its definition outside the workshop where its contours were crafted.

The Supreme Court of the Commonwealth has emphasized the activities of promotion and conclusion of sales contracts as

its distinctive feature. In *Córdova & Simonpietri Insurance* it used the conjunction "and" referring to the two major activities required of an Act 75 dealer when it concluded that an insurance agent who promoted *and* concluded insurance contracts in Puerto Rico was a dealer protected by the Act. We find no reason to assume that the Commonwealth Court intended to use the disjunctive conjunction "or," as plaintiff would have us believe, instead of the conjunction "and" on two separate occasions when it defined the scope of the terms dealer and dealer's contract.

Thus the soundest approach in examining these terms is to abide as closely as possible to the formula provided by the Supreme Court of Puerto Rico. Any analysis of the factual contents of a given commercial relationship must take the basic elements of this formula into account. In the present case, plaintiff has not disputed its lack of authority to approve or reject the orders it dispatched to defendant. It has not controverted the proposed facts that its word was not binding on defendant, that it did not buy any of the equipment sold and that it did not have a say in fixing terms of sales, eventual billing and accounting. It assumed neither the risks nor the responsibilities that go with an Act 75 dealership. It has been shown that plaintiff was a mere forwarder of orders who did not have the authority to close or conclude the sales contracts it promoted. In sum, plaintiff was not a dealer within the definition of the Act and the case law construing it. Defendant's Motion for Summary Judgment is GRANTED. Judgment shall be entered accordingly.

SO ORDERED.