**AN–PORT, INC., Plaintiff,**

**v.**

**MBR INDUSTRIES, INC., Defendant.**

**Civ. No. 91–1050 (JP).**

United States District Court,
D. Puerto Rico.

Sept. 11, 1991.

Fernando L. Gallardo, Woods & Woods, Hato Rey, P.R., for plaintiff.

Pedro J. Santa Sánchez, O'Neill & Borges, Hato Rey, P.R., for defendant.

## OPINION AND ORDER

PIERAS, District Judge.

This is an action for damages predicated upon the Puerto Rico Dealer's Act, Law 75 of June 24, 1964, as amended 10 L.P.R.A. sec. 278 *et seq.* ("Law 75") resulting from the alleged wrongful termination of an alleged dealership agreement between plaintiff, An–Port, Inc. ("An–Port"), and defendant, MBR Industries, Inc. ("MBR"). Now pending before the Court are MBR's Motion for Summary Judgment filed on August 12, 1991 and MBR's Motion to Dismiss Complaint filed on July 19, 1991. An–Port

failed to oppose the Motion For Summary Judgment and tardily opposed the Motion to Dismiss Complaint.

For the reasons set forth in this Opinion and Order, MBR's Motion for Summary Judgment is hereby granted.[1]

This Court's decision requires a two-step analysis. First, we must set forth the interplay of the procedural mechanisms establishing the undisputed facts and then we must determine if in light of those admitted facts, MBR is entitled to summary judgment as a matter of law. We start with the procedural history of the case.

## I. PROCEDURAL HISTORY

An–Port filed its complaint on January 10, 1991. MBR was served personally in Miami, Florida on February 22, 1991. Having obtained extensions of time to plead, MBR timely filed its answer to the complaint on April 15, 1991.

Shortly thereafter, the parties exchanged interrogatories. On April 24, 1991 An–Port served MBR with its set of interrogatories. On May 8, 1991, MBR served An–Port with its First Set of Interrogatories, Requests for Admissions and for Production of Documents.

The Initial Scheduling Conference ("ISC") was held on May 13, 1991. On May 16, 1991 this Court issued its Initial Scheduling Conference Report ("ISC Report") outlining the stipulated and controverted facts, the legal issues of the case, the documentary evidence of the parties, the witnesses for each side and the discovery schedule.

The discovery schedule contained in the ISC Report established the following pertinent deadlines:

a. All outstanding interrogatories to be answered by June 30, 1991.

b. An–Port had to notify MBR of its expert witness by June 30, 1991.

c. MBR had to notify its expert witnesses by July 31, 1991.

---

**1.** We note also that this Court has alternate grounds for dismissing the complaint based on the allegations contained in MBR's Motion to Dismiss Complaint, but we rather reach the pending substantive motions instead of dismissing on procedural grounds.

d. All dispositive motions had to be filed no later than August 12, 1991.

e. An–Port had until August 30 to depose MBR's expert.

f. Discovery was to conclude on August 30, 1991.

On May 21 and May 30, 1991, respectively, MBR served upon An–Port its Second and Third Sets of Interrogatories, Request for Admissions and for Production of Documents. MBR served upon An–Port its Answers to An–Port's interrogatories within thirty (30) days of their receipt. An–Port, on the other hand, moved for an extension of time to answer MBR's three outstanding interrogatories on June 17, 1991.

At the time that An–Port requested the extension of time, An–Port had already defaulted in its obligation to respond to MBR's First Set of Interrogatories, Request for Admissions and Request for Production of Documents propounded on May 8, 1991, which had become due on June 8, 1991. On June 24, 1991 this Court issued a clear, unequivocal and unambiguous Order *instructing An–Port to serve its answers to MBR's three outstanding interrogatories on or before July 7, 1991.* In granting the extension, this Court advised An–Port in no uncertain terms that *"you are the plaintiff and created the complaint and should know all the facts."* (Emphasis supplied).

When An–Port failed to answer the three outstanding interrogatories on July 7, 1991, MBR filed a Motion Advising Court of the Facts which Have Been Admitted by Plaintiff ("Motion on Admitted Facts"). MBR also filed on July 12, 1991 a Motion Requesting the Court to Preclude Plaintiff from Utilizing Experts at Trial for Its Failure to Comply with the June 30, 1991 deadline set to notify its expert witness for trial ("Motion to Preclude"). An–Port did not oppose either motion.

In light of the continuing lack of compliance with the ISC Report and our Order of June 24, 1991, MBR filed the Motion to Dismiss Complaint. We subsequently granted MBR's Motion to Preclude, barring An–Port from naming and utilizing an expert witness at trial. On the same date, July 23, 1991, we also granted MBR's Motion of Admitted Facts, thereby establishing as admitted all the requests for admissions made by MBR which An–Port had failed to answer.

On August 12, 1991 MBR filed the Motion for Summary Judgment based upon the facts voluntarily admitted by An–Port at the ISC and those conclusively established by our Order of July 23, 1991. The undisputed facts were also set forth in an affidavit subscribed by Mr. Bernard Pomeranc, President of MBR (the "affidavit") and in the Statement of Material Facts as to Which There is No Genuine Issue to be Tried (the "Statement of Material Facts"), both filed with the Motion for Summary Judgment pursuant to Rule 311.12 of the Local Rules of this Court.

As previously noted, An–Port has not filed an Opposition to MBR's Motion for Summary Judgment and has not controverted Mr. Pomeranc's affidavit. In fact, An–Port did not move for reconsideration of our July 23, 1991 Order admitting the requests set forth by MBR. Instead, on August 13, 1991, An–Port tardily served upon MBR its answers to MBR's three set of interrogatories ("the Answers"). The Answers arrived over one hundred (100) days after An–Port was served with MBR's First Set of Interrogatories, Request for Admissions and for Production of Documents, over seventy (70) days after service of MBR's Third Set of Interrogatories, Request for Admissions and for Production of Documents and more than thirty (30) days after the July 7, 1991 deadline. In addition, the Answers were served barely two (2) weeks short of the August 30, 1991 discovery deadline imposed by the ISC Report.

On August 20, 1991, An–Port filed its Opposition to MBR's Motion to Dismiss Complaint. On August 22, 1991 MBR filed a Motion Submitting Defendant's Position with Respect to Discovery ("Motion Submitting") apprising this Court of An–Port's non-compliance with the discovery deadline and reserving its right to conduct discovery beyond the Court-mandated deadline of Au-

gust 30, 1991. Finally, on August 27, 1991 MBR moved this Court for leave to reply to An–Port's Opposition to MBR's Motion to Dismiss and proceeded to tender its reply therewith.

## II. THE ADMITTED FACTS

Before setting forth the admitted and undisputed facts of the case, we turn to the procedural mechanism which conclusively established MBR's requests as admitted.

### A. *Rule 36(a)*

Fed.R.Civ.P. 36(a) provides that each matter of which an admission is requested is "... admitted unless, within thirty (30) days of service of the requests or within such shorter or longer time as the Court may allow, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter signed by the party or the party's attorney."

■ The facts admitted either by the Court or by the parties themselves constitute the law of the case for all legal purposes. *Jordan v. Kelly,* 728 F.2d 1 (1st Cir.1984); *Brooks Village North Associates v. General Electric Co.,* 686 F.2d 66 (1st Cir.1982); *Rainbolt v. Johnson,* 669 F.2d 767 (D.C.Cir.1981); *Chart House Inc. v. Bornstein,* 636 F.2d 9 (1st Cir.1980); *Russell v. Commissioner of Patents and Trademarks,* 695 F.Supp. 572 (D.D.C.1988); *Vermont v. Staco, Inc.,* 684 F.Supp. 822 (D.Vt.1988). These facts can be, and usually are, the basis for summary judgment pursuant to Fed.R.Civ.P. 56. *Fiberglass, Inc. v. Techni–Glass Industries, Inc.,* 804 F.2d 1577 (11th Cir.1986); *Milene Music, Inc. v. v. Gotauco,* 551 F.Supp. 1288 (D.R.I.1982); *United States v. Kenealy,* 646 F.2d 699 (1st Cir.1978), *cert. denied* 454 U.S. 941, 102 S.Ct. 478, 70 L.Ed.2d 250 (1981); *Luick v. Graybar Elec. Co., Inc.,* 473 F.2d 1360 (8th Cir.1973); *Williams v. Krieger,* 61 F.R.D. 142 (1973). *Moosman v. Blitz, Inc.,* 358 F.2d 686, 688 (2d Cir. 1966); *O'Campo v. Hardisty,* 262 F.2d 621 (9th Cir.1958); *Mahaney v. Doering,* 260 F.Supp. 1006 (D.Penn.1966); *Jackson v. Kotzebue Oil Sales,* 17 F.R.D. 204 (D.Ak.

1955); *Creedon v. Arielly,* 8 F.R.D. 265 (D.C.N.Y.1948).

As we established earlier, MBR served An–Port with its First, Second and Third Sets of Interrogatories, Request for Admissions and Request for Production of Documents on May 8, May 21 and May 30, 1991 respectively. Pursuant to Fed.R.Civ.P. 36(a), An–Port had to notify the Answers on June 7, 1991, June 20 and June 30, 1991 respectively, and definitely none should be served after June 30, 1991, the deadline set by the ISC Report.

■ When An–Port filed its motion for an extension of time to answer the three sets of interrogatories on June 17, 1991, it had already defaulted on its duty to answer the first request for admissions, and thus, the facts included therein had already been deemed admitted by virtue of Rule 36(a). An–Port's failure to respond to the second and third requests for admissions within the enlarged period given, up to July 7, 1991, similarly resulted in the automatic admission of all the requests contained therein. Thus, our Order of July 23, 1991 granting MBR's Motion of Admitted Facts conclusively established the admitted facts as the law of the case and they can be now utilized to support the summary judgment ordered herein.

### B. *Fed.R.Civ.P. 37(b) Sanctions*

In addition to the provisions of Rule 36(a), we are empowered to order that the matters regarding the request for admissions be established and to preclude An–Port from opposing the matters, all by virtue of Rule 37(b).

Rule 37(b)(2)(A) and (B) provide in pertinent part:

If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, or if a party fails to obey an order entered under Rule 26(f), the court in which the action is pending may make such orders in regard

to the failure as are just, and among others the following:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence.

Fed.R.Civ.P. 37(b)(2)(A), (B).

 Fed.R.Civ.P. 37(b)(2) establishes two prerequisites that must be met before a court can impose any of the sanctions provided therein: (a) There must be a court order in effect; (b) that order must have been violated. *See R.W. International Corp., et al. v. Welch Foods, Inc., et al.,* 937 F.2d 11 (1st Cir.1991). District courts have ample discretion in the range of sanctions they may impose pursuant to Fed.R. of Civ.P. 37. *Velázquez–Rivera v. Sea Land Service, Inc.,* 920 F.2d 1072, 1075 (1st Cir.1990); *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.,* 845 F.2d 1172 (2d Cir.1988).

 In the instant case, we choose to deem as established facts the requests for admissions set forth by MBR and to preclude An–Port from opposing them at this late hour. Our June 24, 1991 Order was a clear, unequivocal and unambiguous discovery order instructing An–Port to "Answer MBR's First, Second, and Third Sets of Interrogatories, Requests for Admissions and for Production of Documents, on or before July 7, 1991." An–Port chose to ignore and disobey our heed and thereby exposed itself to Rule 37(b) sanctions. *See also Fashions House, Inc. v. K Mart Corp.,* 892 F.2d 1076 (1st Cir.1989) (order compelling answers to interrogatories violated); *Damiani v. Rhode Island Hospital,* 704 F.2d 12 (1st Cir.1983) (order compelling answers to interrogatories and request for production of documents violated).

 We may impose the sanctions even in the absence of a motion to compel. *Properties Intern, Ltd. v. Turner,* 706 F.2d 308 (11th Cir.1983); *Professional Seminar Consultants, Inc. v. Sino American Technology Exchange Council Inc.,* 727 F.2d 1470 (9th Cir.1984). Indeed, no motion to compel was required in light of our own Order to compel of June 24, 1991 in response to plaintiff's motion for extension of time to respond.

Nothing contained in the recent *R.W. International Corp.* decision requires us to reach a different result. There, the First Circuit Court of Appeals found that an Order dismissing the complaint based exclusively on Rule 37(b)(2)(C) could not stand in the absence of a clear, unequivocal and unambiguous order in the record to comply with a specific discovery mechanism.

 In the instant case, while dismissal as a sanction is appropriate by virtue of An–Port's disregard of this Court's Order, the dismissal herein, is based upon a determination upon the merits of An–Port's claims. In addition, we issued a clear, unambiguous and unequivocal discovery Order on June 24, 1991 instructing An–Port to *"Answer on or before July 7, 1991 ".* An–Port chose to ignore and disobey our order. Sanctions are therefore warranted to punish An–Port's disobedience and to deter other litigants from similar behavior. *See Fashion House, Inc. v. K Mart Corp., supra.*

 Neither can An–Port's tardy compliance with the discovery order, by purportedly answering the interrogatories and request for admissions and for production of documents on August 13, 1991 require us to reach a different result. At the outset, the Answers are late and no leave to file them has been received. An–Port has not even bothered to explain to us what prompted the delay. An–Port could have sought another extension before the July 7, 1991 deadline, it could have sought reconsideration of our Order of June 24, 1991 or of our subsequent Order of July 23, 1991 admitting the facts. It chose not to do any of the aforesaid.

In *Damiani, supra,* the disobedient party also tardily complied with the discovery order, but that did not detract the District Court from dismissing the action or the Court of Appeals from affirming the dismissal. We see no reason why the late responses should be considered two (2) weeks before the discovery bar date, particularly after they have been due for over one hundred (100) days.

In any event, the admitted facts required to enter summary judgment in this case have been set forth in Mr. Pomeranc's affidavit as well as in the Statement of Facts, neither of which has been controverted by plaintiff. The aforesaid factor alone empowers us to enter summary judgment. See, Fed.R.Civ.P. 56(e); Local Rule 311.12. Finally, facts which are, in an of themselves, dispositive of this case were admitted to already by An–Port itself at the ISC and made to form part of the ISC Order.

### C. *Specific Findings*

In light of the foregoing considerations, we hereby make the following findings of fact:

1. MBR and its predecessors, Variety Distributors, Inc. ("Variety"), Pomer Import, Inc. ("Pomer") and Pomer Import–Export, Inc. ("P.I.E.") have sold in Puerto Rico since 1974 various lines of plastic houseware products manufactured in the Far East and marketed under the federally registered tradenames of "Pomtrex", "Pomware" and "Pomaire", among others, and various brand name products, including electronic products, manufactured in the United States, including closeouts and reconditioned products. (Paragraph 14, MBR's Answers to An–Port's Interrogatories).

2. MBR products were sold in Puerto Rico through other sales representatives prior to the start of the business relationship between An–Port and/or Mr. Angel Portuondo (collectively "An–Port") and MBR. (Paragraph 1, page 3, MBR's Answers to An–Port's Interrogatories; Item "a", Affidavit of B. Pomeranc).

3. Between 1974 and 1976, MBR and its predecessor and their sales representatives opened a number of clients for MBR and its predecessor's products in Puerto Rico. (Item "b", Affidavit of B. Pomeranc; Par. 14, MBR's Answer to Interrogatories).

4. On April 9, 1976, MBR and An–Port entered into a sales agency relationship. (Par. 1, page 1, ISC Report; Item c, Affidavit of B. Pomeranc). The sales agency relationship was of a non-exclusive nature. (Paragraph 13, MBR's Answers to An–Port's Interrogatories). An–Port's responsibilities were to procure orders in Puerto Rico for MBR products. (Item "d", Affidavit of B. Pomeranc, paragraph 2, ISC Report).

5. An–Port received a commission directly from MBR for procuring orders in Puerto Rico for MBR's products. An–Port was paid on a strict commission basis for the sales. (Item "e", Affidavit of B. Pomeranc; Par. 2, ISC Report; Motion on Admitted Facts, Par. 2).

6. During the course of the relationship between An–Port and MBR, An–Port received a commission even on those sales which MBR had difficulty with or could not collect on its invoices. (Affidavit of B. Pomeranc, Item "f"; Motion on admitted Facts, Par. 10, page 6).

7. MBR suffered the impact and risk of clients payment problems including those caused by bad checks and uncollected invoices. (Affidavit of B. Pomeranc, Item "g").

8. During the existence of the relationship, An–Port procured orders for defendant's products, which orders were subject to defendant's approval. Said orders were sent to MBR for shipment to the various customers. (Affidavit of B. Pomeranc, Item "h"; Par. 4, ISC Report).

9. MBR was solely responsible for the decision to approve or reject orders to clients in Puerto Rico. (Affidavit of B. Pomeranc, Item "i"; Par. 4, ISC Report; Motion on Admitted Facts, Par. 17, page 5).

10. MBR's was solely responsible for preparing the invoices and send them directly to its clients in Puerto Rico. An–Port was sent a copy of the invoices.

11. MBR's clients in Puerto Rico paid MBR directly for their purchases in three basic manners:

 (i) directly to MBR;

 (ii) by checks to MBR delivered to An–Port, which deposited the same in MBR's bank account in Puerto Rico;

 (iii) by checks to An–Port, which would replace the checks with An–Port's own. (Affidavit of B. Pomeranc, Item "n"; Par. 5, ISC Report).

12. An–Port deposited those payments received from MBR's clients in a bank account opened by MBR at Roig Commercial Bank in Santurce. An–Port's sole involvement in the collection process was limited to depositing payments made by MBR's clients to An–Port. An–Port had no managing power and/or responsibility over said account; An–Port was not authorized to withdraw funds from said account. (Affidavit of B. Pomeranc, Item "j"; Par. 5, page 3, ISC Report; Motion on Admitted Facts, Par. 5, page 4; MBR's Answers to An–Port's Interrogatories, Par. 4).

13. MBR's clients in Puerto Rico purchased the products directly from MBR through sales contracts executed between MBR and the clients. (Affidavit of B. Pomeranc, Item "P"; Motion on Admitted Facts, Par. 21, page 5).

14. MBR credited its clients' accounts directly for defective or lost merchandise. (Affidavit of B. Pomeranc, Item "q"; Par. 5, page 2, ISC Report).

15. An–Port did not engage in publicity and/or public relations to promote MBR's products. Advertising for MBR's products was undertaken directly by MBR's retail clients who received discounts on their purchases in exchange. (Affidavit of B. Pomeranc, Item "1"; Motion on Admitted Facts, Par. 9; MBR's Answers to An–Port's Interrogatories, Par. 9).

16. It was MBR's sole responsibility to prepare price lists for MBR's products in Puerto Rico. An–Port did not have authority to set the prices for MBR's products in Puerto Rico. Neither did An–Port have authority to establish the credit terms given to clients in Puerto Rico. (Affidavit of

B. Pomeranc, Item "m"; Par. 4, ISC Report; Motion on Admitted Facts, Items # 6 and # 10, page 4).

17. The vast majority of purchase orders for MBR's products were mailed by the clients directly to MBR. (Affidavit of B. Pomeranc, Item "r"; Motion on Admitted Facts, Par. 13, page 5).

18. Orders for MBR's products procured directly by An–Port were sent by An–Port to MBR for delivery to MBR's clients. (Affidavit of B. Pomeranc, Item "s"; Motion on Admitted Facts, Par. 3, page 3).

19. The clients paid all freight charges and Puerto Rico excise taxes for MBR products purchased either directly from MBR or through An–Port. (Affidavit of B. Pomeranc, Item "t"; Motion on Admitted Facts, Par. 15, page 5).

20. An–Port was not authorized to stop selling to MBR's clients or reject their orders. Instead, An–Port required MBR's express authorization before refusing to sell to a client. (Affidavit of B. Pomeranc Item "u"; Motion on Admitted Facts, Par. 16, page 5).

21. An–Port was not authorized to unilaterally place purchase orders on hold, unless specifically authorized by MBR. (Affidavit of B. Pomeranc, Item "v"; Motion on Admitted Facts, Par. 17).

22. MBR supplied An–Port with samples of products for its showrooms, free of charge, to show prospective clients. (Affidavit of B. Pomeranc, Item "x"; Par. 3, ISC Report; Motion on Admitted, Par. 3, page 6). An–Port charged MBR a rental fee for the space utilized by An–Port to display samples of MBR's products. (Affidavit of B. Pomeranc, Item "y"; Par. 5, page 2, ISC Report; Motion on Admitted Facts, Par. 4, page 6). MBR paid the rental fee for the booths utilized by An–Port at trade shows in Puerto Rico to promote MBR's products. (Affidavit of B. Pomeranc, Par. 2; Motion on Admitted Facts, Par. 12, page 6).

23. When An–Port sold MBR products in stateside trade shows, An–Port acted as a commissioned salesman for MBR and re-

ceived a commission on those sales. (Affidavit of B. Pomeranc, Item aa; Par. 5, page 2, ISC Report).

24. An–Port was responsible for collecting only from certain clients that were late in paying their invoices. (Affidavit of B. Pomeranc, Item bb; Motion on Admitted Facts, Par. 2, page 3).

25. An–Port entered into a verbal agreement not to handle and/or represent products that competed directly with those of MBR. (Affidavit of B. Pomeranc, Item cc).

26. An–Port imported into Puerto Rico various plastic products from the same companies that supplied products to MBR such as, but not limited to, plastic lunch boxes, food carriers, canister sets, products from Taiwan and Thailand, imported cutlery sets, clocks and others. An–Port also tried to import pressure cookers directly from the same factory in Brazil that supplied MBR with pressure cookers. When the Brazilian company refused to sell the product to An–Port, An–Port stopped all sales activities for MBR's pressure cookers. An–Port similarly ceased selling other MBR products which An–Port commenced to import directly from MBR suppliers for resale in the Puerto Rico market. The sales were in direct competition with MBR and in violation of the agreement not to sell competitive products. During this time, An–Port remained MBR's sales representative in Puerto Rico. (MBR's Answers to An–Port's Interrogatories, Par. 18(a). Affidavit of B. Pomeranc, Item dd).

27. An–Port improperly and unfairly utilized information it obtained during the course of its engagement by MBR as its sales representative for its own benefit and to the detriment of MBR. An–Port consequently obtained direct access to MBR's suppliers, bought from them the same products that MBR sold in the Puerto Rico market in direct competition with MBR. All the foregoing, substantially and adversely affected MBR's interests in the development of the Puerto Rico market. An–Port's conduct was deliberate and intentional and placed An–Port in the position of selling on its own account products which were identical, in all material respects, to MBR's products. (MBR's Answers to An–Port's Interrogatories, Par. 18(b); Affidavit of B. Pomeranc, Item ee; Motion on Admitted Facts, Par. 18, page 5).

28. Some of the products bought and imported by An–Port into Puerto Rico, which competed directly with those of MBR's, exhibited labels identical to those placed by the manufacturers on products sold to MBR. Those labels were produced by the manufacturers specially for MBR, utilizing MBR's art work. (Affidavit of B. Pomeranc, Item "ff"; Motion on Admitted Facts, Par. 20, page 5).

29. In a letter dated April 6, 1990, MBR communicated to An–Port its concerns and displeasure with the decreasing sales and collections, an increase in returned merchandise and the lack of new clients for MBR's products. The letter attributed these problems to An–Port's increasing attention to its own products to the detriment of those of MBR. The letter further placed An–Port on notice that unless there was some improvement in its performance, MBR would seek "new representation". (Affidavit B. Pomeranc, Item gg; Par. 6, ISC Report).

30. On September 11, 1990, MBR notified An–Port that due to the lack of improvement of the situation described in the April 6, 1980 letter MBR was terminating their non-exclusive verbal sales agency agreement with An–Port. (Affidavit B. Pomeranc, Item hh; Par. 7, ISC Report).

### D. The Facts Admitted at the ISC

This Court finds that, among the aforementioned established facts, plaintiff admitted at the ISC several facts which are, in and of themselves, dispositive of plaintiff's claims herein, brought pursuant to Law 75. These facts are the following:

1. The relationship between MBR and Mr. Angel Portuondo and An–Port was a sales agency relationship;

2. Mr. Portuondo and An–Port's responsibilities were to procure orders in Puerto Rico for MBR's products;

3. Mr. Portuondo and An–Port were paid by MBR on a strict commission basis for their sales;

4. Subject to verification by An–Port's counsel, MBR's products exhibited by An–Port in its showroom were obtained from MBR free of charge as "samples" for An–Port to show prospective clients;

5. An–Port did not have authority to set the price for MBR's products;

6. An–Port did not have authority to set the terms of payment for MBR products An–Port sold to MBR's clients in Puerto Rico;

7. During the existence of the relationship, An–Port procured orders for MBR products, which orders were subject to MBR's approval;

8. It was MBR's exclusive responsibility and decision to approve or withhold shipments to its clients in Puerto Rico;

9. It was MBR's exclusive responsibility to prepare the invoices and send the same directly to its clients in Puerto Rico, although An–Port was sent a copy of said invoice;

10. MBR clients in Puerto Rico paid to MBR for their purchases in three (3) basic manners:

a. Directly to MBR;

b. By checks to MBR delivered to An–Port, who deposited the same in MBR's bank account in P.R.;

c. By checks made out to An–Port, on which occasions An–Port issued a check to MBR to cover those payments;

11. MBR credited its clients' accounts directly for defective or lost merchandise;

12. The parties stipulated, although subject to verification by plaintiff's counsel, that MBR paid An–Port rent for the space in An–Port's premises which was used to display the samples of MBR products;

13. When An–Port sold MBR products in stateside trade shows, An–Port received from MBR a commission on those sales;

14. An–Port deposited the payments received from MBR's clients in a bank account opened by MBR at Roig Commercial Bank in Santurce;

15. An–Port's authority pertaining to MBR's bank account at Roig Commercial Bank was limited to making deposits. An–Port was not authorized to withdraw funds from said account;

16. In a letter dated April 6, 1990, MBR communicated to An–Port its concern and displeasure with the decrease in sales and collections, an increased in returned merchandise and the lack of new clients for MBR's products. The letter attributed An–Port's problems to plaintiff's attention to its own products to the detriment of those of MBR. The letter further placed An–Port on notice that unless there was some improvement on its performance, MBR would seek "new representation."

## III. SUMMARY JUDGMENT

### A. *Standard of Review*

Under Fed.R.Civ.P. 56(c), summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *Medina Muñoz v. R.J. Reynolds*, 896 F.2d 5 (1st Cir.1990); *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989); *Trevcon, Inc. v. Marina de Palmas, Inc.*, 626 F.Supp. 335, 341 (D.P.R.1986). *See also, Celotex Corp. v. Cattret*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). A "genuine" issue is one that is dispositive and therefore, must be decided at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Mack v. Great Atlantic & Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989). A "material" fact is one which affects the outcome of the suit and must be resolved before attending to related legal issues. *Mack v. Great Atlantic v. Pacific Tea Co.*, 871 F.2d at 181.

■ The party moving for summary judgment shoulders the initial responsibility of demonstrating that there is no genuine issue of material fact requiring a trial, *Celotex Corp. v. Catrett, supra,* 477 U.S. at 323, 106 S.Ct. at 2553; *Oliveras Sales v. Puerto Rico Highway Authority,* 884 F.2d 1532, 1536 (1st Cir.1989). Once the moving party has met this initial burden, the burden then shifts to the other party to establish the existence of a triable fact or issue. *Celotex Corp. v. Catrett, supra,* 477 U.S. at 324, 106 S.Ct. at 2553.

■ The non-moving party must adduce specific facts establishing the existence of at least one issue that is both genuine and material. *Anderson v. Liberty Lobby, Inc., supra; Local 48 United Brotherhood of Carpenters v. United Brotherhood of Carpenters,* 920 F.2d 1047, 1050 (1st Cir.1990); *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990). Thus, Fed.R.Civ.P. 56(c) mandates that summary judgment be entered against a party who fails to establish the existence of an element essential to that party's case. *Celotex Corp. v. Catrett, supra.*

In the instant case, as we noted earlier, MBR has moved this Court for the entry of summary judgment predicated upon uncontroverted facts that have been conclusively established, and which demonstrate that there is no genuine issue of material fact remaining requiring a trial. An–Port, on the other hand, has admitted at the ISC facts which are in an of themselves dispositive of its claims herein, brought under Law 75. In addition, An–Port has elected not to file an opposition to the motion for summary judgment; it has failed to controvert Mr. Pomeranc's affidavit; and has omitted to dispute MBR's statement of material facts. By failing to do all the foregoing, An–Port has not met its burden to direct this Court to the existence of one single element of its case that is genuine, material and in controversy, and thus requiring a trial on the merits. *Anderson v. Liberty Lobby, Inc., supra.* Taking as we must, the admitted facts, we only have to apply the following applicable substantive law to conclude our analysis.

**B. *Law 75***

MBR's Motion for Summary Judgment is predicated upon two separate grounds. First, MBR contends that the agreement existing between it and An–Port was a verbal non-exclusive sales agency relationship not protected by Law 75, and therefore, terminable at will. In addition, MBR claims that even if An–Port is deemed to be a "dealer" under Law 75, MBR had just cause to terminate the existing relationship pursuant to Section 278(d) of Law 75 because of (1) An–Port's non-performance of essential obligations of the commercial relationship, and (2) An–Port's acts and/or omissions which adversely and substantially affected the interests of MBR in promoting, marketing and distributing its products in Puerto Rico. We deal with each ground separately.

### 1. *Definition of a Dealer*

Section 278(a) of Law 75 defines a "dealer" as a:

"person actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service."

10 L.P.R.A. Sec. 278(a).

Section 278(b) of Law 75 defines a "dealer's contract" as the:

"relationship established between a dealer and a principal or grantor whereby and irrespectively of the manner in which the parties may call, characterize or execute such relationship, the former actually and effectively takes charge of the distribution of a merchandise, or of the rendering of a service, by concession or franchise, in the market of Puerto Rico."

10 L.P.R.A. Sec. 278(b).

In *San Juan Mercantile Corporation v. Canadian Transport Co., Ltd.,* 108 D.P.R. 211 (1978) the Commonwealth Supreme Court defined the term "dealer" under section 278(a) as one who by its efforts:

"... create[s] a favorable market and conquer[s] a clientele for a product or service by promotion and execution of sales contracts. Its function generally

comprises those activities necessary for the transfer from the manufacturer to the consumer or some intermediate point between the two, of the products or services that it represents. Publicity, coordination of the market, deliveries of merchandise, collections, the maintenance of inventories and principally the promotion and conclusion of sales contracts are in general terms the obligations of the distributor." (Translation supplied) (Citations omitted.)

Ten years later, the Commonwealth Supreme Court reaffirmed and further clarified the definition of a "dealer" under Law 75 in *Roberto Gómez, Inc., et al. v. Oxford Industries, Inc.*, Opinion and Judgment of June 30, 1988, 88 J.T.S. 102, when it held:

"To determine if one is confronted with the concept of a 'dealer' various factors must be taken into account, among them: if the 'dealer' carries out an active promotion and/or conclusion of contracts; if it acquires inventory; if it exercises control over the prices; if it has discretion regarding the sales terms; if it has responsibility for the delivery and collection of the merchandise and authority to extend credit; if it carries out advertising endeavors, independently or jointly; if it has assumed the risk and responsibility in the activity he conducts; if it purchases a product; if it has physical facilities and offers to its clients services related to the product." (Translation supplied)

This Court, in turn, has been consistent in finding that a commissioned salesman is *not* a "dealer" within the scope of Section 278(a) when it does not have an obligation to purchase inventory; does not deliver the merchandise sold; does not maintain warehouse facilities; nor extends credit to customers; cannot approve or reject orders nor engage in any form of advertising. *See Cruz Ramos v. Brother International Corp.*, 445 F.Supp. 983 (D.P.R.1978), *aff'd* 588 F.2d 817 (1st Cir.1978). *Sudoest Import Sales Corp. v. Union Carbide Corp.*, 569 F.Supp. 1547 (D.P.R.1983), *aff'd*, 732 F.2d 14 (1st Cir.1984); *Francheschini v. Riley Co.*, 591 F.Supp. 414 (D.P.R.1984);

*Morales v. Gregg Shirt Makers, Inc.*, 682 F.Supp. 142 (D.P.R.1988).

It is worth mentioning at this juncture that the admitted and uncontroverted facts of this case are very similar to those in *Roberto Gómez, Inc. et al v. Oxford Industries, Inc., supra*. There, plaintiff, *Gómez*, essentially procured orders for the defendant's products, sent them for service to the defendant in the Mainland and then received a commission on those sales. There was no transfer of title of the goods over to the plaintiff. Plaintiff had no credit related authority; did not maintain an inventory of the products it represented; did not undertake collection; did not have any responsibility or was affected by returned merchandise; made relatively small investment in advertising and publicity; and received a commission determined exclusively on the volume of sales, regardless of whether the goods purchased were paid or not by the client.

■ Applying the foregoing principles to the admitted and uncontroverted facts of this case, we conclude that An–Port did not undertake any of the generally recognized obligations of a dealer as outlined in *Roberto Gómez, Inc., et al., supra*, and the above-cited decisions of this Court. As An–Port itself admitted at the ISC, it procured orders for MBR products. As An–Port admitted at the ISC, it was paid on a strict commission basis. An–Port was not a party to the sales contracts for the purchase of MBR products executed between MBR and its clients. An–Port had no responsibility for and did not undertake promotions; nor warehouse inventory; had no say or control over prices or the terms of sale; nor any responsibility for the delivery of the merchandise it represented. An–Port did not purchase the products it represented. Freight charges and excise taxes for the products were paid by the individual buyers and An–Port did not advertise nor undertook public relations activities. An–Port did not have authority to approve orders nor to withhold shipment of products.

An–Port was not exposed to any of the risks that a "dealer" generally must accept

and live with. In this respect, it was MBR who credited its clients directly for defective or lost merchandise; it was MBR who shouldered the impact and the risk of clients' payment problems, including those caused by uncollected invoices and by bad checks. An–Port even received a commission on sales which MBR could not collect upon. MBR supplied An–Port samples of its products for its showroom "free of charge". An–Port even charged MBR a rental fee for the space it utilized to display MBR's samples in its showroom.

An–Port also admitted at the ISC that MBR's clients paid MBR for their purchase in three basic manners: (a) directly; (b) by checks made out to MBR, but handed to An–Port which deposited the same in MBR's bank account; and (c) by checks made out to An–Port which An–Port replaced with its own checks payable to MBR. An–Port also admitted at the ISC that it could only make deposits to MBR's bank account and that it could not withdraw funds. It is evident that the contracts for the purchase of MBR's products were executed between MBR and its clients and that An–Port was merely an intermediary. It is also evident that An–Port had little collection responsibilities and perhaps most importantly, it did not bear the credit risk. Finally, during the ISC, An–Port itself stated that it was MBR's sales representative in Puerto Rico and that its relationship with MBR was a sales agency.

In summary then, the admitted and uncontroverted facts of this case—including the determinative facts that An–Port acknowledged since the early stages of the proceedings in this case—all show that An–Port fails to meet any of the generally recognized characteristics of a "dealer" as defined by section 278(a) of Law 75 and the interpretative Commonwealth and Federal case law. Since An–Port was not a "dealer", its relationship with MBR fell outside the protection of Law 75. Hence, the rela-

tionship could be terminated at will. As a matter of law, MBR is entitled to summary judgment on this point alone.[2]

### 2. *Existence of Just Cause*

We have concluded that An–Port is not a "dealer" as defined by Law 75 and its interpretative case law. This determination, mandated by this record, suffices to dispose of this case. Nevertheless, even assuming that An–Port were protected by Law 75, we find that the termination of the relationship is not actionable as a matter of law. We explain:

Section 278(d) of Law 75 defines just cause as:

> "the non-performance of any of the essential obligations of a dealer's contract, on the part of the dealer, or any action or omission on his part that adversely and substantially affects the interests of the principal or grantor in promoting the marketing or distribution of the merchandise or service."

10 L.P.R.A. Sec. 278(d).

Just cause under Section 278(d) applies only to those acts and/or omissions of the distributor. *Medina & Medina v. Country Pride Foods,* Opinion and Judgment of June 30, 1988, 88 J.T.S. 106. As the statute expressly provides, these acts or omissions must be in direct violation of an essential condition of a contract or they must adversely and substantially affect the interests of the principal or grantor in promoting the marketing or distribution of its merchandise. *Warner Lambert Co. v. Puerto Rico Superior Court, supra.*

Just cause under Law 75 has been found in the following circumstances:

(1) when a dealer used the principal's trademarks of products for unfair competition and without authority. *Jordan K. Rand, Ltd. v. Lazoff Bros.,* 537 F.Supp. 587 (D.P.R.1982); *Luis Avilés v. Carvel Corp.,* Opinion and Order of February 5, 1990, 90 D.C.O. 26;

---

**2.** What the facts of this case seem to demonstrate is that An–Port was in fact the commissioned sales agent that the Commonwealth Legislature sought to protect with Law 21 of December 5, 1990. Unfortunately for An–Port, its relationship with MBR is not protected by Law

21 because the relationship preceded the passage of the statute, which application is prospective both by express provision of the statute and by constitutional mandate. *See Warner Lambert Co. v. Puerto Rico Superior Court,* 101 D.P.R. 378 (1973).

(2) when a dealer assigned its contractual rights to a competitor of the principal. *Pan American Computer Corp., et al. v. Data General Corp.,* 652 F.2d 215 (1st Cir.1981);

(3) when a dealer had limited sales, did not operate its own service organization and did not keep adequate inventory. *Luis Rosario, Inc., et al. v. Amana Refrigeration, Inc., et al.,* 733 F.2d 172 (1st Cir. 1984);

(4) when a dealer consistently violated the established payment terms; *PPM Chemical Corp. v. Saskatoon Chemicals, Ltd.,* 931 F.2d 138 (1st Cir.1991); and

The admitted and uncontroverted facts of this case show that An–Port imported into Puerto Rico various lines of plastic and electronic products bought from MBR suppliers, and used said products to compete directly with those sold by MBR in Puerto Rico, all while An–Port was still MBR's sales representative on the Island. (MBR's Answers to An–Port's Interrogatories, Par. 18(a)(b); (Affidavit of B. Pomeranc, Item "ee"). An–Port's actions violated the oral contract of the parties whereby An–Port agreed not to distribute competing products. (Affidavit of B. Pomeranc, Item "cc").

Furthermore, some of the products which An–Port acquired from MBR's suppliers for resale in Puerto Rico in direct competition with MBR products exhibited labels identical to those placed by the same manufacturers on products sold to MBR. Said labels had been produced by the manufacturers especially for MBR utilizing MBR's art work. (Affidavit of B. Pomeranc, Item "ff"; Motion of Admitted Facts, Par. 20, page 5).

All the foregoing actions on the part of An–Port adversely and substantially affected the interests of MBR in promoting and marketing its products in Puerto Rico and—wholly apart from MBR's right to put an end to a relationship that was terminable at will—eventually led to the termination of the relationship.

 The aforesaid actions of An–Port also violated the duty of good faith which An–Port owed to MBR. The requirement of good faith between the parties in a contract is one of the general requirements of the system of law in Puerto Rico. Said requirement must guide all contacts between the contracting parties during the existence of the relationship. *Velilla v. Pueblo Supermarket, Inc.,* 111 D.P.R. 585, 587–588 (1981); *Prod. Tommy Muñiz, Inc. v. COPAN,* 108 D.P.R. 699 (1978). Distribution contracts in themselves are characterized for their continuity, stability and *mutual trust,* among other requirements (emphasis supplied); *Radamés Cobos Liccia y su esposa, etc. v. Dejean Packing Co., Inc., et al.,* 89 JTS 104; *Medina & Medina v. Country Pride, supra; Soler Motors v. Kaiser Jeep,* 108 D.P.R. 134 (1978).

 A broker like An–Port has the same duties and liabilities towards his principal as those which an agent has towards his principal. 12 Am.Jur.2d *Brokers,* sec. 83 (1964). Thus, a broker, like the agent, is a fiduciary and is required to exercise fidelity and the utmost good faith, loyalty and honesty toward his principal at all times. 12 Am Jur.2d *Brokers,* 84 (1964). *Wadsworth v. Adams,* 138 U.S. 380, 11 S.Ct. 303, 34 L.Ed. 984 (1890); *Leather Mfgs. Bank v. Morgan,* 117 U.S. 96, 6 S.Ct. 657, 29 L.Ed. 811 (1885).

The facts of this case clearly demonstrate that An–Port breached the confidence and trust that MBR deposited in it. An–Port used the information obtained from MBR to unfairly compete with MBR to the detriment of the later. Clearly, An–Port did not exercise the required honesty, fidelity, good faith, and thus, MBR was entitled to terminate the existing relationship. More than just cause existed for the termination.

## IV. CONCLUSION

In view of all the foregoing, MBR's Motion for Summary Judgment is granted. Judgment shall be entered accordingly.

IT IS SO ORDERED.