J. Soler Motors, Inc., demandante, reconvenida y recurrida, *v.* Kaiser Jeep International Corp., y/o American Motors Corporation, demandadas y peticionarias, *v.* Jeep Corp. y Jeep de Puerto Rico, Inc., demandadas, reconvenientes y recurridas.

*Número:* O-77-336    *Resuelto:* 4 de diciembre de 1978

*Samuel T. Céspedes,* abogado de Kaiser Jeep International Corporation; *Teodoro Peña García,* abogado de J. Soler Motors, Inc., *José Emilio Motta,* abogado de Jeep de Puerto Rico, Inc.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

La causa de acción en este caso se ejercita bajo las disposiciones de la Ley de Contratos de Distribución, Ley Núm. 75 de 24 de junio de 1964, 10 L.P.R.A. sec. 278, reclamando la recurrida J. Soler Motors, Inc., daños alegadamente sufridos por el menoscabo de las relaciones contractuales establecidas con los recurrentes Kaiser Jeep International Corporation y otros. El tribunal de instancia dictó una orden provisional contra los recurrentes ordenándoles continuar en todos sus términos las relaciones establecidas en el Contrato de Distribución Directa otorgado el 23 de octubre de 1968 y abstenerse de realizar acto u omisión alguna en menoscabo de dicha relación. (¹)

Los recurrentes impugnan en este recurso la validez de la orden interdictal y suscitan interesantes cuestiones que ameritan considerarse relacionadas con el alcance de la Ley Núm. 75, *supra*, específicamente, 1) si las relaciones establecidas

---

(¹) La Orden dispone:

"Se ordena a las demandadas Kaiser Jeep International Corporation y/o American Motors Corp., Jeep Corporation y a sus apoderados, sucesores, distribuidores, agentes y/o empleados, a continuar en todos sus términos las relaciones establecidas de principal distribuidor con la demandante, mediante el Contrato de Distribución Directa, otorgado el 23 de octubre de 1968; y abstenerse de realizar acto u omisión alguna en menoscabo de la misma o variar en forma alguna dicha relación; se le ordena, además entregarles las órdenes de vehículo marca Jeep, piezas y demás accesorios que le solicita la demandante bajo los mismos precios, términos y condiciones recientes que se le concede, según facturación en Puerto Rico, a cualquiera de sus distribuidores, concesionarios o agentes; se le ordena a las demandadas entregar la mercancía ordenada por la demandante en un plazo que será equivalente al plazo de tiempo acostumbrado bajo el contrato de distribución antes mencionado. Mientras esta orden se halle en vigor se le prohíbe a las demandadas gestionar, nombrar o negociar el establecimiento de nuevos distribuidores para áreas comprendidas en el Contrato de Distribución con la demandante, a saber:

| | | |
|---|---|---|
| Bayamón | Morovis | Vega Baja |
| Orocovis | Comerío | Manatí |
| Naranjito | Vega Alta | Dorado |

"NOTIFIQUESE:

"DADA en Bayamón, Puerto Rico, a 8 de agosto de 1977."

entre las partes caen bajo su ámbito, y 2) si propiamente hubo un menoscabo de las relaciones contractuales entre las partes.

Los hechos son esenciales para la discusión de las cuestiones planteadas por lo que procedemos a resumirlos.

La recurrida J. Soler Motors, Inc., fue designada en el 1962 traficante (*dealer*) de los vehículos y piezas Jeep en el área de Bayamón por Félix A. Thillet, quien a la sazón era el distribuidor general de dichos vehículos en Puerto Rico. Thillet recibía una comisión de un 7 1/2% sobre los vehículos y un 10% sobre las piezas que compraban los traficantes. En el 1968 Thillet y Kaiser Jeep International Corporation terminaron por mutuo acuerdo la relación de distribución, sustituyendo Kaiser el sistema de distribuidor general por uno de venta directa a los traficantes regionales. El nuevo sistema se instituyó mediante el otorgamiento de un Contrato de Distribución Directa que confirió a la recurrida J. Soler Motors, Inc., el derecho de vender al detal los productos Jeep en el área de Bayamón, reservándose Kaiser el derecho de vender al detal o al por mayor en dicha área, de participar en subastas del gobierno de Puerto Rico o de Estados Unidos y de ceder el contrato. Se dispuso, además, que J. Soler Motors, Inc., pagaría los precios vigentes a la fecha de entrega, que Kaiser suministraría listas de precios pero reservándose el derecho de alterarlos sin notificación previa. (²)

Con motivo de una merma sustancial en las ventas de los vehículos Jeep, la recurrente efectuó en junio de 1975 un estudio de su sistema de mercadeo con el propósito de determinar la posibilidad de volver al sistema anterior de un distribuidor general que se hiciera cargo de la distribución, tal y como lo había hecho hasta el 1968 Félix A. Thillet. El estudio recomendó que se designara distribuidor general a Yuyo González, Inc., quien cubría la región de Ponce, gozaba del

---

(²) El tribunal de instancia infirió de la prueba desfilada que también se firmaron contratos similares con los demás traficantes.

mejor récord de ventas de vehículos y piezas Jeep en Puerto Rico, tenía la capacidad de crédito necesaria y mantenía facilidades físicas adecuadas para inventario y servicios. González organizó una corporación para atender las funciones de distribución, la Jeep de Puerto Rico, Inc., manteniéndola separada de su negocio de traficante en el área de Ponce.

Los Contratos de Distribución Directa incluyendo el de la recurrida J. Soler Motors, Inc., fueron cedidos por Kaiser a Jeep de Puerto Rico, Inc., en noviembre de 1975. En virtud de esta cesión, J. Soler Motors, Inc., venía obligada a tramitar sus órdenes de compra y las garantías de los vehículos Jeep a través de Jeep de Puerto Rico, Inc., cuyo inventario de vehículos y piezas radica en Ponce.

La recurrida J. Soler Motors, Inc., había hecho gestiones con Kaiser para obtener la distribución general de los vehículos Jeep y al informársele de la designación de Jeep de Puerto Rico Inc., objetó la cesión a ésta de su contrato de traficante de área, se negó reiteradamente a hacer negocios con ella e insistió en continuar sus relaciones directamente con Kaiser. Hay en el récord correspondencia en la que Kaiser afirma a la recurrida que se mantendrían los mismos términos y condiciones y que la cesión no alteraría la forma de determinar los precios ni le acarrearía desventajas competitivas.

Conviene apuntar que la cesión del contrato de traficante a Jeep de Puerto Rico, Inc., se hizo conforme las disposiciones de la cláusula 28 del propio contrato que reservó el derecho de Kaiser a cederlo y a quedar relevado de sus obligaciones en virtud de tal cesión.

Así las cosas, la recurrida J. Soler Motors, Inc., instó demanda al amparo de la Ley Núm. 75, *supra*, reclamando la suma de $3,000,000 en resarcimiento de los daños alegadamente ocasionados por la cesión del contrato la cual, a su juicio, constituyó una terminación sin justa causa en violación a la mencionada ley. Simultáneamente solicitó una orden de entredicho provisional para dejar sin efecto la cesión y man-

tener sus relaciones contractuales directamente con Kaiser. El tribunal dictó el interdicto preliminar, objeto de esta revisión, ordenándole a Kaiser continuar las relaciones establecidas en el Contrato de Distribución Directa otorgado en el 1968, entregar las órdenes de compra de la recurrida bajo los mismos precios, términos y condiciones y prohibiéndole nombrar nuevos distribuidores en Bayamón y pueblos adyacentes. Véase escolio (1) *supra*.

Expedimos el auto para revisar y en auxilio de nuestra jurisdicción suspendimos los efectos del interdicto preliminar emitido por el tribunal de instancia.

Dos cuestiones debemos resolver: a) ¿Es J. Soler Motors, Inc., una distribuidora protegida por la Ley Núm. 75, *supra*?, b) Si lo es, ¿constituyó la cesión un menoscabo de la relación contractual entre las partes?

## I

En la transferencia de un producto del fabricante al consumidor generalmente intervienen en sus distintos niveles varios intermediarios que forman la cadena de distribución. Estos intermediarios pueden clasificarse en distintas formas, comerciantes mayoristas, agentes distribuidores, detallistas, concesionarios por franquicias, representantes de fábrica, etc. El proceso de distribución los incluye a todos, tanto al primer intermediario que es el distribuidor general como al último que transfiere el producto al consumidor, el detallista. La cadena de distribución puede también estar dividida en zonas o regiones y en cada uno de sus niveles puede estar integrada por uno o más intermediarios.

En la industria automotriz de los Estados Unidos el sistema de distribución es a través de la concesión de franquicias a los traficantes. Cundiff-Still-Govoni: *Fundamentals of Modern Marketing*, a la pág. 216 (1973 Prentice-Hall, Inc., Englewoods Cliffs, New Jersey). Este fue precisamente el

sistema que utilizó la recurrente en Puerto Rico desde 1968 a 1975.

■ La Ley Núm. 75, *supra*, tiene el propósito de proteger a los intermediarios puertorriqueños que representan un producto o un servicio en los distintos niveles de la cadena de distribución. Al respecto, el Art. 1 de dicha ley define en términos amplios y abarcadores los conceptos "distribuidor" y "contrato de distribución":

"Para los propósitos de este Capítulo, los siguientes términos tendrán el significado que se expresa, excepto cuando el contexto claramente indique un significado diferente:

a) Distribuidor: *persona realmente interesada en un contrato de distribución por tener efectivamente a su cargo en Puerto Rico la distribución, agencia, concesión o representación de determinada mercancía o servicio.*

b) Contrato de distribución: relación establecida entre un distribuidor y un principal o concedente, mediante la cual, *e irrespectivamente de la forma en que las partes denominen, caractericen o formalicen dicha relación, el primero se hace real y efectivamente cargo de la distribución de una mercancía, o de la prestación de un servicio mediante concesión o franquicia, en el mercado de Puerto Rico.* (Bastardillas nuestras.)
Art. 1, 10 L.P.R.A. sec. 278.

La recurrente, sin embargo, sostiene la inaplicabilidad de la Ley Núm. 75, *supra*, aduciendo que la recurrida J. Soler Motors, Inc., es sólo una traficante al detal en el área de Bayamón sin exclusividad en la venta de los vehículos Jeep; que su limitada función de detallista en un sector no exclusivo impide que se le considere como el distribuidor que real y efectivamente tiene a su cargo el mercado, función ésta que en el pasado desempeñó Thillet hasta 1968, luego Kaiser Jeep International Corp., hasta 1975 y de ahí en adelante Jeep de Puerto Rico, Inc.

■ No aparece ni en el texto de la ley ni en su enjuto historial referencia alguna a requisitos de exclusividad en la

distribución o que tal actividad tenga que cubrir todo el territorio de Puerto Rico.

Las cláusulas de exclusividad no tienen aceptación en la industria de automóviles porque pueden estar en conflicto con las leyes contra los monopolios. Véase: Estrella, Arturo, Dr.: *El Contrato de Agencia o Representación Comercial*, 31 Rev. Col. Abo. de P.R., 248, escolio 19 (1970). Desde el 1952 la División Antimonopolística del Departamento de Justicia de los Estados Unidos obligó a la industria automotriz a eliminar la cláusula de representación exclusiva en sus contratos. Véase: Kessler: *Automobile Dealer Franchises: Vertical Integration by Contract*, 66 Yale L.J. 1135, 1147–1148, 1158 y 1161 (1957).

Al interpretar un estatuto debemos siempre conciliar los conflictos que puedan surgir con otras disposiciones legales. Por eso, ante el posible conflicto de las cláusulas de exclusividad con las leyes antimonopolísticas no podemos asumir que fue la intención de la Asamblea Legislativa al aprobar la mencionada Ley Núm. 75 el establecer la exclusividad en la distribución como requisito para los remedios en ella estatuidos.

Tampoco fue la intención legislativa el requerir que la actividad de distribución cubriera todo el territorio de Puerto Rico. El Art. 3 de dicha ley parece indicar lo contrario, pues al incluir la plusvalía como factor a considerar en la fijación de la cuantía de daños declara que ésta se determinará tomando en consideración la proporción del mercado de Puerto Rico que representa el volumen de distribución del agente. (3) Si fuera requisito de la Ley Núm. 75 que el distri-

(3) El Art. 3 dispone que la cuantía de daños se fijará a base de los siguientes factores:

".   .   .   .   .   .   .   .

"(c) la plusvalía del negocio, o aquella parte de ésta atribuible a la distribución de la mercancía o la prestación de los servicios de que se trate, a ser determinada dicha plusvalía tomando en consideración los siguientes factores:

buidor abarcara todo el territorio de Puerto Rico no sería lógico considerar como factor la "proporción del mercado de Puerto Rico" pues él representaría *todo* el mercado de Puerto Rico. Este factor sólo cobra sentido cuando la distribución está limitada a un área determinada. Por otro lado, no sería consistente con los propósitos de la Ley Núm. 75 ni con su propio texto el excluir de su protección a concesionarios que, como J. Soler Motors, Inc., han mantenido con la recurrente una relación mercantil que se caracteriza por su continuidad, estabilidad, confianza mutua, coordinación entre ambas partes en calidad de empresarios independientes, sin subordinación jerárquica, y, en cuya virtud, la recurrida ha hecho una inversión sustancial, todas las cuales son notas distintivas del contrato de agencia. Véase: Garriguez: *III Tratado de Derecho Mercantil*, Vol. 1, pág. 536 (1963).

■ La función de J. Soler Motors, Inc., ha sido siempre la misma: concesionaria para la venta al detal de los vehículos Jeep en el área de Bayamón. Así fue desde 1962 cuando Thillet era el distribuidor general en Puerto Rico, continuó la misma función con Kaiser Jeep International Corp., en 1968 al otorgarse el Contrato de Distribución Directa, y, de ahí en adelante con Jeep de P.R., Inc., cuando en el 1975 Kaiser le cedió dicho contrato. El mero hecho de que en la cadena de distribución se introdujera un nuevo intermediario en el 1975, Jeep de P.R. Inc., no altera la condición de distribuidora de la recurrida. En cada una de esas etapas la protegía la Ley Núm. 75, no importa cómo las partes hubieren denominado, caracterizado o formalizado sus relaciones contractuales ni las estructuras o mecanismos corporativos que el principal

---

"(1) . . . . . . . .
"(2) . . . . . . . .
"(3) *proporción del mercado de Puerto Rico que dicho volumen representa;*
. . . . . . . ."
(Bastardillas nuestras.) Art. 3(c)(3), 10 L.P.R.A. sec. 278b.

hubiese creado para encubrir la verdadera naturaleza de la relación. Arts. 1 y 4 de la Ley Núm. 75, *supra*.

Concluimos, por tanto, que la Ley Núm. 75, *supra*, protege a la recurrida J. Soler Motors, Inc., como concesionaria no exclusiva de los automóviles y piezas Jeep en el área de Bayamón.

## II

No es necesario que nos detengamos a considerar el planteamiento de la recurrente al efecto de que si se concluyera, como lo hemos hecho, que J. Soler Motors, Inc., es una distribuidora, entonces, lo fue desde antes de la vigencia de la Ley Núm. 75, *supra*, y no podría aplicársele retroactivamente dicha ley en virtud de lo resuelto en *Warner Lambert* v. *Tribunal Superior*, 101 D.P.R. 378 (1973). Basta apuntar que el Contrato de Distribución Directa entre Kaiser Jeep International, Corp. y J. Soler Motors Inc., se otorgó en el 1968, después de estar en vigor la Ley Núm. 75, *supra*, y que dicho contrato estableció una nueva relación contractual que expresamente canceló y anuló las anteriores. Véase Cláusula 25 del Contrato de Distribución Directa. (⁴) El planteamiento de retroactividad resulta, por tanto, inmeritorio.

Procederemos a considerar si la cesión del contrato de Distribución Directa a Jeep de Puerto Rico, Inc., constituyó un menoscabo de las relaciones establecidas por dicho contrato entre Kaiser Jeep International Corp. y J. Soler Motors, Inc.

---

(⁴) La Cláusula 25 lee:

". . . and this Agreement supersedes, cancels and annuls all contracts, understandings and agreements of prior date between the parties hereto and shall continue in force and govern all transactions between the parties hereto until the expiration hereof or the cancellation or termination hereof by either party, and Dealer hereby releases and forever discharges the Company from any claims, demands, or causes of action which it may have against it arising out of or by reason of any matter or thing occurring prior to the date hereof, except as to credits heretofore approved and allowed in writing by the Company arising under any preceding agreement in effect at the time of execution of this Agreement."

El tribunal de instancia concluyó que la cesión del contrato a Jeep de Puerto Rico, Inc., menoscabó la relación existente entre las partes porque: a) el tener que tramitar J. Soler Motors, Inc., las órdenes de compra y las garantías de los vehículos por conducto de Jeep de Puerto Rico, Inc., conlleva dilaciones, b) aumentó los costos de los vehículos en un 7 1/2% y en un 10% el de las piezas, y, c) que las cartas de crédito requieren ahora más tiempo.

La recurrida intenta sostener las conclusiones del tribunal con el argumento de que la cesión menoscabó sus relaciones con la recurrente porque se hizo a favor de un competidor "con todo el detrimento que esto conllevaría en términos de que se le supla efectivamente las unidades que sus clientes le requieran, imposibilidad de asistir a subastas públicas por no poder competir en precios con el distribuidor."

No hay prueba alguna en autos relativa a dilaciones en el trámite de órdenes de compra y de garantías. En verdad no puede haberlas ya que la recurrida nunca ha hecho negocios con el cesionario Jeep de Puerto Rico, Inc. Su actitud siempre ha sido objetar la cesión, rehusando reiteradamente hacer negocios con el cesionario e insistiendo en continuar relaciones directamente con la recurrente. Por otro lado, la cesión se hizo, no al competidor Yuyo González, sino a Jeep de Puerto Rico, Inc., entidad separada y distinta de aquél, en la misma forma que la recurrida J. Soler Motors, Inc., es una entidad separada y distinta de Joaquín Soler Chevrolet, Inc., que representa los vehículos marca Chevrolet.

Debe recordarse que el sistema de un distribuidor general establecido en el 1975, vino como consecuencia de una baja notable en las ventas de vehículos Jeep y por la necesidad de establecer un sistema de mercadeo más eficiente. El Contrato de Distribución de Jeep de Puerto Rico, Inc., específicamente requiere que el distribuidor general tenga un inventario de vehículos y piezas adecuadas para atender las órdenes de compra, para promover las ventas y estar en condiciones de

dar servicio eficiente a los traficantes. Véase International Distributor Franchise, secs. 2.3 y 2.5, *exh*. 20 del demandado. Independientemente de estas obligaciones contractuales es lógico asumir que Jeep de Puerto Rico, Inc., tiene un claro interés en atender y tramitar las órdenes de compra de todos sus traficantes por la sencilla razón de que ese es su negocio y le produce beneficios económicos. No hay justificación en el récord para inferir que por propósitos mezquinos de competencia Jeep de Puerto Rico, Inc., habría de faltar a sus obligaciones contractuales en detrimento de sus propios intereses. Notamos a este respecto que obra en el récord comunicación de Jeep de Puerto Rico, Inc., a J. Soler Motors, Inc., indicándole a ésta su interés en hacer negocios con ellos y de Soler rechazando consistentemente tal invitación. *Exh*. 19 de los demandados.

En ausencia total de prueba, la objeción de la recurrida a la cesión es más bien de conveniencia pues se funda en que la cesión se hizo a favor de otro traficante, sin embargo, ella no tuvo reparo alguno en gestionarla para sí, a pesar de que ella también era traficante.

Incidió el tribunal de instancia al concluir sin base alguna en el récord que la cesión del Contrato de Distribución Directa a Jeep de Puerto Rico, Inc., conlleva dilaciones en los trámites de las órdenes de compra de vehículos y piezas.

Con respecto a la conclusión relativa a los costos de vehículos y piezas, sostiene la recurrente que no se trata de un aumento en los costos por motivo de la cesión sino del diferencial que siempre ha existido entre el costo al distribuidor general y el costo al traficante. Efectivamente, la prueba documental revela que Thillet recibía un beneficio de 7 1/2 por ciento en la venta de vehículos a los traficantes. Véase Agreement of Mutual Release and Settlement, pág. 58 del Apéndice de la Solicitud de Revisión. Igualmente aparece que antes de la cesión, bajo el Contrato de Distribución Directa con Kaiser, el costo de los vehículos a traficantes era de 7 1/2 por ciento

más alto que el del distribuidor. Véase al efecto la lista de precios netos al distribuidor de febrero de 1975 (*Exh.* 3 de la demandada) y la lista de precios netos al traficante. (*Exh.* 4 de la demandada.) En dichas listas aparece que el precio neto al distribuidor del Jeep C-5 Modelo 84 era de $3,075.00 mientras que el precio neto al traficante era de $3,295.00, o sea, un 7 1/2 por ciento más bajo. Es decir, que tanto bajo Thillet como bajo el Contrato de Distribución Directa siempre hubo un diferencial de 7 1/2 por ciento en el costo de los vehículos a los traficantes.

Notamos, además, que tanto antes como después de la cesión se efectuaron aumentos en los costos de los vehículos de alrededor de un 11 por ciento, probablemente como consecuencia de alzas en los costos de producción. Ejemplo de ello es que en septiembre de 1974 el Jeep C-5, Modelo 83 tenía un precio neto para el traficante de $2,970. Cinco meses después el mismo vehículo había aumentado a $3,295, un 11 por ciento en su precio neto. Pero ya para noviembre de 1975, que fue cuando se llevó a cabo la cesión, el precio había aumentado a $3,370, un poco más de un 2 por ciento en un período de nueve meses. No hay controversia sobre el derecho del recurrente a alterar los precios pues expresamente el Contrato de Distribución Directa se lo reservó.

La recurrida, sin embargo, insiste en que el diferencial de costos le impide participar en subastas en competencia con el distribuidor Jeep de Puerto Rico, Inc. No es correcto. El Contrato de Distribución Directa reservó a Kaiser el derecho de licitar en subastas públicas pero la realidad es que Kaiser siempre se abstuvo de participar. Al respecto el tribunal de instancia concluyó que este derecho se había variado verbalmente. Al efectuarse la cesión del contrato a Jeep de Puerto Rico, Inc., Kaiser garantizó a la recurrida que se mantendrían las mismas condiciones y términos que habían prevalecido hasta entonces. Esta garantía se confirmó en las vistas celebradas en el tribunal de instancia al declarar el señor Gonzá-

lez que Jeep de Puerto Rico, Inc., se abstendría de participar en subastas en la misma forma que hasta entonces lo había hecho su antecesor (pág. 22 del Alegato de Réplica del Recurrente), garantía que consistentemente reafirmó el recurrente en la solicitud de revisión y en los múltiples y voluminosos alegatos que ha sometido a este Tribunal. De manera que la posición de la recurrida con respecto a su participación en subasta pública no ha sido alterada, y, por tanto, no se han menoscabado sus relaciones contractuales con el recurrente.

*En vista de las anteriores consideraciones, se dictará sentencia anulando la orden provisional y devolviendo el caso al tribunal de instancia para que fije los honorarios a favor del recurrente.*