**EUROMOTION, INC. d/b/a Prime Wholesalers, Plaintiff, Appellant,**

v.

**BMW OF NORTH AMERICA, INC., Defendant, Appellee.**

**No. 97–1802.**

United States Court of Appeals, First Circuit.

Heard Dec. 3, 1997.

Decided Feb. 24, 1998.

---

Rafael Escalera–Rodriguez, with whom Edna Hernandez and Richard & Escalera, San Juan, PR, were on brief, for appellant.

Manuel A. Guzmán, with whom Carlos A. Steffens and Manuel A. Guzman Law Offices, were on brief for appellee.

Before BOUDIN, Circuit Judge, CAMPBELL and BOWNES, Senior Circuit Judges.

CAMPBELL, Senior Circuit Judge.

Euromotion, Inc. ("Euromotion") brought this diversity action against BMW of North

America, Inc. ("BMW"), alleging that BMW had terminated Euromotion's · dealership agreement without good cause in violation of Puerto Rico's Law 75 of June 24, 1964, P.R. Laws Ann. tit. 10, § 278 *et seq.* ("Law 75"), and that BMW had failed to negotiate with Euromotion in good faith concerning a dealership, thereby violating Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141. BMW moved for summary judgment arguing, *inter alia,* that the undisputed facts established that Euromotion had never been a BMW dealer, and that BMW had never in fact negotiated with Euromotion. The district court granted BMW's motion. We affirm the district court's grant of summary judgment.

## I. BACKGROUND.

We state the facts in the light most favorable to Euromotion. *See Casas Office Machs., Inc. v. Mita Copystar Am., Inc.,* 42 F.3d 668, 684 (1st Cir.1994).

Beginning in 1991, Euromotion, an independent vendor of automobiles, without encouragement from BMW, began to perform many of the functions of a BMW dealer in Puerto Rico. It bought BMW automobiles from independent dealers in Florida for resale in Puerto Rico, maintained an extensive BMW inventory, acquired sales facilities, and advertised having BMW automobiles for sale.

BMW had no authorized dealer of its own in Puerto Rico, and in 1993 began to search for an establishment to serve as its exclusive dealer there. Euromotion's president corresponded with BMW about Euromotion's expressed desire to become the exclusive BMW dealer in Puerto Rico. In October 1993, BMW interviewed Euromotion's president and other potential candidates for the dealership position.

· Around the same time, ·BMW instituted an export prohibition on its automobiles. As a result of that prohibition, Tom Bush BMW, an independent BMW dealer in Florida, informed BMW and Euromotion that it would not continue to sell cars to Euromotion.

Sometime in October or November of 1993, John Ciontea, the area manager for BMW, met with Manuel Soltero, Euromotion's president (the "1993 meeting"). Also present at this meeting were Luis Rios, an automobile dealer used by Euromotion, and Carlos Kirigin, a sales representative for a Florida BMW dealership by the name of Fields BMW. At this meeting, Soltero expressed concern that BMW's newly implemented prohibition on exports would impede Euromotion's ability to obtain BMW's cars. In response, Ciontea gave Kirigin (and through him, Fields BMW) the "green light" to sell cars and other paraphernalia to Euromotion. According to Euromotion, BMW encouraged it to develop the Puerto Rican market and to keep its inventories high. BMW also told Euromotion's president not to worry about the lack of a written dealer application packet because "everything would be put [i]n black and white" eventually.

Euromotion contends that the 1993 meeting established a dealer relationship with BMW. After the meeting, Euromotion sold only BMW's cars and attempted to develop the Puerto Rican market for such cars. Euromotion obtained these cars from Fields BMW in Florida at a wholesale price. Although it is clear from the record that BMW did not have the authority to impose any terms or conditions on Fields BMW regarding its sale of automobiles to Euromotion, and although these sales were negotiated between Fields BMW and Euromotion, Fields BMW would have charged Euromotion a higher price if the 1993 meeting had not taken place. Euromotion also obtained brochures, T-shirts, and other BMW-related advertising materials from Fields BMW. Further, the BMW-authorized service representative in Puerto Rico gave full warranty service to cars sold by Euromotion.

The parties agree that Euromotion never bought a car directly from BMW, never placed a purchase order with BMW, never received any promotional material directly from BMW, never consulted or negotiated directly with BMW the prices or terms of its sales relationships with any of BMW's independent dealers, and never saw a copy of BMW's dealership agreement.

On December 13, 1993, Soltero acknowledged in a letter written to BMW that BMW had "a lot of candidates for the [BMW deal-

ership] franchise ... [that] I understand you have to evaluate." Soltero expressed the "hope that before [BMW picked its] candidate [it] should come to Puerto Rico and give [Euromotion] a chance to show our business, meet our great staff and finally demonstrate why we are the best choice to proudly represent the BMW franchise in Puerto Rico." Soltero also asked BMW to "always remember that [Euromotion] already control[s] the BMW market and everybody recognize[s] us as the BMW dealer in Puerto Rico."

On June 22, 1995, BMW announced in the Puerto Rican papers that it had chosen a company called "Autogermana" to serve as the exclusive BMW dealer for Puerto Rico. Sometime after Autogermana was appointed as BMW's authorized dealer in Puerto Rico, Fields BMW ceased to give Euromotion the benefit of advantageous prices and business terms.

On June 25, 1996, Euromotion filed the present action alleging that BMW had violated Law 75 and the duty of good faith and fair dealing imposed by Article 1802 of the Puerto Rican Civil Code. Thereafter, Euromotion filed a motion for preliminary injunctive relief under Law 75, which the court denied after discovery and a hearing. On October 24, 1996, BMW filed a motion for summary judgment on both of Euromotion's claims.

On May 21, 1997, the district court allowed BMW's summary judgment motion. On the Law 75 claim, the district court found that Soltero's letter of December 13, 1993, wherein he acknowledged that there were many contenders for BMW to evaluate for a possible Puerto Rican dealership, established conclusively that an actual dealer relationship did not then exist as a result of the prior meeting between Ciontea and Soltero. On the good faith claim, the court found that none of the interactions between BMW and Euromotion constituted negotiations. Since no negotiations took place, the court reasoned that BMW was not under a duty to negotiate in good faith. The court did not address BMW's statute-of-limitations defense. On May 22, 1997, the court dismissed the case with prejudice. Euromotion has appealed. We affirm.

## II. STANDARD OF REVIEW.

■ We review a grant of summary judgment *de novo*, viewing "the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990) (citations omitted). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ Summary judgment is properly awarded against a party who, "after adequate time for discovery ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Not all disputes preclude summary judgment, only those that relate to genuine issues of material fact. "The evidence manifesting the dispute must be 'substantial,' going beyond the allegations of the complaint." *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975) (citations omitted). Further, "neither conclusory allegations, improbable inferences, and unsupported speculation, nor [b]rash conjecture coupled with earnest hope that something concrete will materialize" prevent us from awarding summary judgment. *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir.1996) (internal quotation marks and citations omitted). Rather, to prevail over a properly supported motion for summary judgment, a nonmoving party must establish the existence of a trial-worthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)).

## III. DISCUSSION.

### A. *The Law 75 Claim.*

██ Law 75 prohibits a principal from terminating its business relationship with a dealer unless the principal has "just cause." [1] P.R. Laws Ann. tit. 10, § 278a. We interpret the language of Law 75 "in the light of the ends sought by the statute," *see Sudouest Import Sales Corp. v. Union Carbide Corp.,* 732 F.2d 14, 16 (1st Cir.1984), which are "to protect Puerto Rico dealers from the harm caused when a supplier arbitrarily terminates a distributorship once the dealer has created a favorable market for the supplier's products, 'thus frustrating the legitimate expectations and interests of those who so efficiently carried out their responsibilities,' " *R.W. Int'l Corp. v. Welch Food, Inc.,* 13 F.3d 478, 482 (1st Cir.1994) (citing *Medina & Medina v. Country Pride Foods, Ltd.,* 858 F.2d 817, 820 (1st Cir.1988)).

To that end, Law 75 is drafted in broad terms. Law 75 defines a dealer as a "person actually interested in a dealer's contract." P.R. Laws Ann. tit. 10, § 278(a). A "dealer's contract" includes any business relationship

> established between a dealer and a principal or grantor whereby and irrespectively of the manner in which the parties may call, characterize or execute such relationship, the former actually and effectively takes charge of the distribution of a merchandise, or the rendering of a service, by concession or franchise, on the market of Puerto Rico.

P.R. Laws Ann. tit. 10, § 278(b).

Euromotion argues that it succeeded in raising an issue of material fact regarding whether the 1993 meeting created a dealer-principal relationship. Euromotion analogizes its relationship with BMW (through Fields BMW) to the dealer relationship in a case decided by the Puerto Rican Supreme Court, *J. Soler Motors, Inc. v. Kaiser Jeep International Corp.,* 8 P.R. Offic. Trans. 138, 108 D.P.R. 134 (1978). In *J. Soler Motors,* the defendant appointed the plaintiff as its dealer in Puerto Rico, then assigned the dealership contract to its general distributor in the area. *See id.* at 141. This meant that the dealer had to place orders for cars and parts through the general distributor. *See id.* Despite the presence of this intermediary, the court applied Law 75 to cover the dealer. *See id.* at 145.

We are not persuaded. In *J. Soler Motors,* the plaintiff had signed a dealership contract setting out detailed terms to govern its business relationship with the defendant. No such evidence appears in the present case. Euromotion admits that it never even saw the standard dealership agreement routinely used by BMW much less became a party to such a contract.

Perhaps sensing the weakness in its argument, Euromotion notes that we have defined the necessary dealer relationship for Law 75 purposes quite generously. We have held that a party still in the process of negotiating the final terms of a dealer's contract may fall under the protective aegis of Law 75 where, for some time, it had been acting de facto as a dealer. *See Welch,* 13 F.3d at 486.

But *Welch* was an altogether different case. The defendant in *Welch* had written to the plaintiff stating that it had "reached a decision to continue the frozen food distribution ... in Puerto Rico by transferring [its] account to [the plaintiff]." *Id.* at 480. In that same letter, the defendant agreed to "draft an agreement" that would establish the plaintiff as an authorized dealer. *Id.* Shortly afterwards, while still in the process of negotiating the terms of a written dealership agreement, the parties began doing business directly with one another as if a dealer relationship had already been formalized.

The defendant in *Welch* conceded that the plaintiff was "performing the functions of a distributor within the meaning of Law 75." *Id.* at 482. In the circumstances, we stated that Law 75 "clearly incorporates within its

---

1. The relevant portion of Law 75 states:

   Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause.

   P.R. Laws Ann. tit. 10, § 278a.

reach any arrangement between a supplier and dealer in which the dealer is actually in the process of distributing the suppliers' merchandise in Puerto Rico." *Id.* at 482–83.

Focusing only on the last statement quoted above, Euromotion argues that whenever "parties are dealing, a dealership exists for purposes of the Act," quoting *Welch*, 13 F.3d at 484. We made that statement, however, in a context very different from that at bar. First, Euromotion never reached the point here of becoming engaged in negotiations with BMW regarding the terms of an actual dealership contract. Second, there is no substantial evidence that BMW ever designated Euromotion, even informally, to act as its authorized dealer as distinct from continuing to sell BMW cars independently. Third, the parties in *Welch* directly dealt with one another for over a year in the manner of a de facto dealership arrangement. Although the lack of direct dealings may not always be determinative, *see J. Soler Motors*, 8 P.R. Offic. Trans. at 145, direct business relations as in *Welch* can provide evidence of a dealer relationship. Fourth, Euromotion's president wrote a letter to BMW after the dealer relationship was supposedly established in which he acknowledged that BMW had "a lot of candidates for the [BMW dealership] franchise ... [that] I understand you have to evaluate." This letter is clearly inconsistent with Euromotion's position that it had an understanding with BMW that it was BMW's authorized dealer. *Welch*, therefore, is in no sense dispositive.

■ Euromotion also argues that Law 75 allows recovery by any dealer, such as itself, who "invest[s] time, effort, and expense in the development of a market, ... even where

certain other trappings of the typical dealership [are] missing." *Sudouest Import Sales Corp.*, 732 F.2d at 16 (citation omitted). However, unilateral efforts to sell a product and develop a market are not sufficient, alone, to create a dealer relationship within the purview of Law 75. *See Lineas Aereas Costarricenses v. Caribbean Gen., Inc.*, 682 F.Supp. 117, 121 (D.P.R.1988) (collecting cases).

It is true that there is evidence that BMW encouraged its independent dealer in Florida, Fields BMW, to continue its favorable business relationship with Euromotion. At that time, BMW may well have been pleased, and so expressed itself, by Euromotion's efforts to sell BMW automobiles in Puerto Rico. However, BMW's encouragement of Euromotion to proceed at that time as an independent seller of BMW automobiles could not create a dealer relationship.

On this record, the only conclusion a reasonable fact finder could reach is that Euromotion did not have a dealer relationship within Law 75 with BMW. The absence of such a relationship is fatal to its claim. *See Welch*, 13 F.3d at 483 (declaring that Law 75 "insists upon establishment of a 'supplier/dealer' relationship"). Accordingly, the district court correctly dismissed Euromotion's Law 75 claim.

B. *Duty to Negotiate in Good Faith.*

■ The Puerto Rican Supreme Court has held that, although parties generally may withdraw from negotiations at any time prior to forming a contract, parties once engaged in a negotiation process have a duty to proceed in good faith.[2] *See Producciones Tom-*

---

**2.** The Puerto Rican Supreme Court has applied the duty of good faith in situations where a party breaks off a course of negotiations aimed at reaching a contractual agreement. *See Producciones Tommy Muñiz, Inc.*, 13 P.R. Offic. Trans. at 676. In that case, the court declared that the duty of good faith probably arises from Article 1802 of the Civil Code, *see id.* at 677, which states:

A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done. Concurrent imprudence of the party aggrieved does not exempt from liability, but entails a reduction of the indemnity.

P.R. Laws Ann. tit. 31, § 5141. A court evaluating whether a party has violated its duty to negotiate in good faith by interrupting negotiations should examine six factors:

(1) the development of the negotiations, (2) how did they begin, (3) their course, (4) the conduct of the parties throughout them, (5) the stage at which the interruption took place, (6) the parties' reasonable expectations to form a contract, as well as any other relevant circumstance under the facts of the case submitted to judicial scrutiny.

*Producciones Tommy Muñiz, Inc.*, 13 P.R. Offic. Trans. at 680.

*my Muñiz, Inc. v. COPAN*, 13 P.R. Offic. Trans. 660, 676, 113 P.R. Dec. 517 (1982). Euromotion charges that BMW violated that duty. The district court did not explore the question whether BMW had terminated negotiations with Euromotion in bad faith because it found that Euromotion had failed to demonstrate that Euromotion and BMW ever reached the point of becoming involved in contract negotiations.

Euromotion asserts that it is "indisputable" in light of the evidence that the court, in reaching its conclusion, improperly weighed the credibility of the witnesses. Since our review is *de novo*, *see Griggs–Ryan*, 904 F.2d at 115, we need not consider whether the specific reasoning set out by the district court contained errors. Rather, we ask whether the evidence presented by Euromotion was adequate to establish that negotiations sufficient to be regarded as such ever took place between the parties. *Cf. Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552 (stating that, in order to avoid a properly supported motion for summary judgment, a nonmoving party must make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). We find Euromotion's evidence insufficient to establish that a course of negotiations looking to the creation of a dealer's contract ever occurred. We therefore affirm the district court.

According to Euromotion, the following facts constituted negotiations between itself and BMW. First, Euromotion's president was interviewed by BMW, along with other candidates, to determine whether to select Euromotion for the position of dealer. Second, BMW encouraged Euromotion in 1993 to continue to sell BMW automobiles, as it was then doing, and develop a market in Puerto Rico. Third, BMW urged Fields BMW at that time to aid Euromotion in developing the Puerto Rican market, as it had been doing for a while. Fourth, because Euromotion's president believed that Euromotion was being considered as a candidate for the Puerto Rican dealership, Euromotion took action to create a larger market for BMW's cars in Puerto Rico. Fifth, Euromotion kept BMW informed of its progress.

None of the above, in our view, were negotiations such as might trigger the duty of good faith in the Puerto Rican Civil Code. Rather they were preliminary activities and dealings reflecting, among other things, a modicum of initial interest by BMW in Euromotion's activities as an independent salesman of BMW vehicles, and also reflecting Euromotion's intense but unsuccessful efforts to become a finalist for the dealership position. While BMW encouraged Euromotion to proceed with its independent sales of BMW cars and interviewed Euromotion's president along with others, BMW never selected Euromotion as someone with whom it intended to negotiate a dealership contract. And, in fact, no contract negotiations ever took place. None of the interactions between the parties addressed the concerns that parties looking to form a dealer relationship would address. BMW and Euromotion did not discuss inventory requirements, sales goals, promotional allowances, showroom standards, trademark use, minimum service facilities, warranty conditions, payment and credit arrangements, letters of credit, or personnel and staffing requirements. Further, the record establishes that Euromotion never submitted the required dealer application to BMW and never saw the BMW authorized dealer standard agreement. Lastly, Euromotion's letter to BMW in December of 1993 confirms that Euromotion understood itself to be just one candidate among several. The district court concluded that: "None of this [evidence presented by Euromotion] constitutes contract 'negotiations' by any stretch of the imagination." We agree.

█ It is true, of course, that "when the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir. 1995); *see also Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11 (noting that a judge should not weigh the evidence when considering a motion for summary judgment). Still, a court should not indulge a nonmoving party's inferences if they do not "flow ration-

ally from the underlying facts." *Rubinovitz v. Rogato*, 60 F.3d 906, 911 (1st Cir.1995). On the facts of this case viewed in the light most favorable to Euromotion, no reasonable fact finder could conclude that BMW entered into negotiations with Euromotion concerning the formation of a dealership contract. It follows that BMW's refusal, for whatever reason, to talk further with Euromotion could not amount to a breach of Puerto Rico's doctrine requiring parties who enter into contract negotiations to proceed in good faith. We hold that summary judgment was appropriate on Euromotion's good faith claim.

*Affirmed.*