[Not for Publication - Not to be Cited as Precedent]

# United States Court of Appeals
## For the First Circuit

No. 01-1270

SIMONE-ALYS ALWYN, INDIVIDUALLY AND AS PARENT AND NEXT FRIEND,
B/N/F PERIELL ALWYN, B/N/F SIDANNEN ALWYN, B/N/F CERRIDWEN
ALWYN; MICHAEL ALWYN, INDIVIDUALLY AND AS PARENT AND NEXT
FRIEND OF PERIELL ALWYN, SIDANNEN ALWYN AND CERRIDWEN ALWYN,

Plaintiffs, Appellants,

v.

JOHN DUVAL; MICHAEL RUSSELL, LT.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
and Stahl, Senior Circuit Judge.

Paula J. Werme for appellant.
Charles P. Bauer, with whom John T. Alexander and Ransmeier
& Spellman Professional Corporation were on brief, for appellee.

November 5, 2001

**STAHL, <u>Senior Circuit Judge</u>**.  Michael and Simone-Alys Alwyn appeal from the dismissal of their civil rights action against two Concord police officers, filed in June of 1999 pursuant to 42 U.S.C. § 1983.  The appellants first claimed that Officer John Duval and Lieutenant Michael Russell violated their constitutional rights by making misrepresentations about the condition of their apartment, which resulted in the appellants temporarily losing custody of their children.  The district court dismissed this claim for lack of subject matter jurisdiction pursuant to the <u>Rooker</u>-<u>Feldman</u> doctrine.  Second, the appellants alleged that the officers violated their Fourth and Fourteenth Amendment constitutional rights by conducting a warrantless search of their home.  This claim was dismissed by the district court on defendants' motion for summary judgment after finding that there were no genuine issues of material fact in dispute.  The Alwyns appeal these adverse rulings.  We affirm.

## I.

On June 12, 1996, Mrs. Alwyn reported to the Concord Police Department that two of her children were missing. Officer Duval was dispatched to the Alwyns' home, and upon his arrival, asked the Alwyns whether he could search the house because "missing" children are frequently found to have been

hiding inside their own home. Duval became suspicious when appellants insisted that they had already searched the house and refused to allow him to enter. Duval asked Mrs. Alwyn if there was any reason why they would not want the police to enter the apartment. She responded that the apartment merely was not "very well kept inside." Officer Duval was then joined by a canine officer of the New Hampshire State Police. The officers explained to the Alwyns that, in order for the police dog to search for the children, it needed to obtain the girls' scent. Notwithstanding this advice, appellants continued to refuse to allow the officers entry to the apartment. Instead, they brought out articles of the children's clothing for the police to use. Officer Duval informed them that it was still necessary for the canine officer and search dog to enter the apartment because the search dog needed to sniff the clothing without any other person having touched it, so that only the children's scent would be present on the garment. Duval then told the Alwyns that he did not think they were giving their full cooperation and that precious time was slipping away. Finally, Mr. Alwyn agreed to let the police enter the apartment. However, the parties disagree as to the scope of the consent ultimately given, with the appellants insisting that they consented only to the canine officer entering the premises

solely for the purpose of obtaining articles of their daughters' clothing, and with the appellees, on the other hand, maintaining that Mr. Alwyn stated "I don't care, go in the apartment," signifying unrestricted consent to enter and search for the children as well.

Mr. Alwyn went into the apartment with the canine officer, and Duval followed. The canine officer found what he needed near the door and left. Upon entering, Officer Duval observed an extremely unkempt and dirty apartment,[1] and summoned his supervisor, Lieutenant Russell, to assist him in searching the premises until they were satisfied that the missing children were not there. Shortly thereafter, the girls were discovered in the neighborhood and were taken to the Concord Police Station.

When the Alwyns were notified by the police that their missing daughters had been located, they were instructed to bring their other children to the station house. Based on

---

[1]According to the affidavit of Officer Duval, "[t]he entire apartment floor, including living room, kitchen, bathroom and bedrooms were [sic] covered with piles of trash, garbage and spoiled food, which was mixed up with piles of clothing. The odor in the house was consistent with rotting food." Officer Duval also claims to have observed "the kitchen counters completely covered with meals which appeared to be several days old. . . [and] a foil pan containing the carcass of cooked turkey which appeared to be several days old." Lieutenant Russell's affidavit offers a description consistent with that provided by Officer Duval.

Duval's and Russell's observations about the conditions in the Alwyn home, all of the children were taken into protective custody and placed in foster homes.[2]  On June 14, 1996, the New Hampshire Division of Children, Youth and Families ("DCYF") filed child neglect petitions in Concord District Court.  On February 13, 1997, after a full evidentiary hearing, the Concord District Court entered a finding of neglect.  On April 10, 1997, the Concord District Court issued a dispositional order, authorizing the DCYF to continue its legal supervision over the children.  In May 1997, the Alwyns appealed the dispositional order to the Merrimack County Superior Court.  However, because the conditions described in the complaint had been corrected, DCYF agreed to terminate the neglect petitions if the Alwyns agreed to terminate their appeal of the February order.  The Alwyns agreed and DCYF filed a "Withdrawal of Petitions" on June 11, 1997, and the appeal was terminated.[3]

Appellants raise two issues in this appeal: first, that the district court erred in ruling that the Rooker-Feldman

---

[2]Although the child welfare proceedings continued for almost a year, the children were returned to the custody of their parents within days of their removal from the Alwyn home.

[3]As the district court noted, "the parties have not explained the process that ended the superior court proceeding," and no further information about the termination of the state court litigation has been provided to this Court.

-6-

doctrine mandated the dismissal of their misrepresentation claim against the officers; and second, that summary judgment on the unlawful search claim was inappropriate.  We turn first to the Rooker-Feldman issue.

## II.

A federal district court is without subject matter jurisdiction to review the final decisions of a state court of competent jurisdiction.  Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923).  A district court also may not hear federal claims that are "inextricably intertwined" with the state court's denial of a claim in a judicial proceeding.  District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482 (1983).[4] Even when a party does not actually raise the federal claims in the state court proceeding, "Rooker-Feldman forecloses lower federal court jurisdiction over claims that are 'inextricably intertwined' with the claims adjudicated in state court."  Sheehan v. Marr, 207 F.3d 35, 40 (1st Cir. 2000).  A federal claim is inextricably intertwined with the state court claims "if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it."  Hill v. Town of

_____

[4]For a more detailed discussion of the origin of the Rooker-Feldman doctrine, see Wilson v. Shumway, 264 F.3d 120, 123-24 (1st Cir. 2001), and Hill v. Town of Conway, 193 F.3d 33, 34 n.1 (1st Cir. 1999).

Conway, 193 F.3d 33, 39 (1st Cir. 1999). This court reviews *de novo* a dismissal for lack of subject matter jurisdiction pursuant to the Rooker-Feldman doctrine. Wilson v. Shumway, 264 F.3d 120, 123 (1st Cir. 2001).

In the present case, the U.S. District Court held that, pursuant to the Rooker-Feldman doctrine, it had no subject matter jurisdiction to hear the Alwyns' misrepresentation claim in light of the Concord District Court's February 13, 1997 finding of neglect. The district court reasoned that, in order for appellants' claim to succeed, the fact-finder would have to reject the officers' testimony regarding the condition of the Alwyns' home, which would directly contradict the determination already made by the state tribunal. Consequently, the district court dismissed the count.

Appellants maintain that there is no final state judgment that would trigger the Rooker-Feldman doctrine in this case. Citing State v. Anderson, 142 N.H. 918 (1998), appellants argue that once they filed their appeal to the Merrimack County Superior Court, the Concord District Court's finding of neglect was vacated and rendered a legal nullity. Anderson held that the state does not violate a guarantee against double jeopardy when it honors a defendant's request for a second *de novo* trial after the first proceeding has resulted

-8-

in a conviction. See 142 N.H. at 922. Anderson does not suggest, however, that the filing of an appeal renders all prior proceedings a legal nullity, regardless of what transpires thereafter. In child welfare proceedings, absent a specific directive by the court, a dispositional order remains in effect unless and until the superior court overrules the decision after conducting a second *de novo* hearing. See N.H. R.S.A. § 169-C:28 ("An appeal under this chapter may be taken to the superior court by the child or the child's authorized representative or any party having an interest, including the state, or any person subject to any administrative decision pursuant to this chapter, within 30 days of the final dispositional order; but an appeal shall not suspend the order or decision of the court unless the court so orders."). Therefore, even though the Alwyns would have been entitled to a *de novo* rehearing on the issue of neglect, the mere filing of their appeal did not vacate the finding of the Concord District Court.

Furthermore, the Alwyns chose not to appeal the initial finding of neglect in exchange for the termination of state supervision, which, as they conceded at oral argument, makes this case indistinguishable from a nonsuit. The New Hampshire Supreme Court has explicitly held that "the effect of a nonsuit taken after an appeal is to let the judgment of the court below

-9-

'stand as if no appeal had been taken.'"  Appeal of Nolan, 134 N.H. 723, 730 (1991) (quoting Simpson v. Gafney, 66 N.H. 477, 477 (1891)).  Consequently, the finding of neglect qualifies as a final judgment of a state court, from which no appeal can be heard in federal district court under the Rooker-Feldman doctrine.[5]  Accordingly, this count of the Alwyns' complaint was properly dismissed.[6]

## III.

The Alwyns also appeal the decision of the district court granting summary judgment for the defendants on their claim that the officers violated their Fourth and Fourteenth Amendment rights by conducting a warrantless search of their apartment.  Summary judgment is appropriate where there are no issues of material fact in dispute and "the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  This Court reviews a grant of summary judgment de novo, examining the record in the light most favorable to the non-

------

[5]Appellants have conceded that the Rooker-Feldman doctrine applies and dismissal was required if the Concord District Court's finding of neglect was, in fact, a final state court judgment.

[6]In light of the disposition above, we need not address any other obstacles that appellants would need to overcome in order to sustain a section 1983 claim stemming from the officers' alleged misrepresentations.  See, e.g., Anderson v. Creighton, 483 U.S. 635 (1987) (qualified immunity); Briscoe v. LaHue, 460 U.S. 325 (1983) (absolute immunity).

moving party.  Euromotion, Inc. v. BMW of N. Am., Inc., 136 F.3d 866, 869 (1st Cir. 1998).

A search conducted without a warrant is presumptively unreasonable and violates the Fourth Amendment unless an exception to the warrant requirement exists.  Bilida v. McCleod, 211 F.3d 166, 171 (1st Cir. 2000).  Valid consent overcomes this presumption and renders the search constitutionally valid, United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000), but the search must not exceed the scope of the consent given.  United States v. Coraine, 198 F.3d 306, 310 (1st Cir. 1999).  The appropriate inquiry for determining the scope of the consent given asks, "what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  United States v. Turner, 169 F.3d 84, 87 (1st Cir. 1999).

In the affidavit filed in conjunction with their opposition to the defendants' motion for summary judgment, the appellants claim that Mr. Alwyn gave only the canine officer and not Officer Duval permission to enter the home, and only for the purpose of obtaining an article of clothing from the missing children, so that the search dog could acquire the scent.[7]

---

[7]The Alwyns have not argued that consent was given involuntarily.

However, at the state neglect hearing, Mr. Alwyn was explicitly asked whether he told Officer Duval, "I don't care, go in the apartment," to which he responded "Yes, I did say that." In granting summary judgment, the district court relied upon Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13 (1st Cir. 2000), where this Court held that "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory answer of why the testimony is changed." Id. at 20 (quoting Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994)).

The appellants have offered no adequate explanation as to why the admission made by Mr. Alwyn during the state adjudicatory proceedings should now be disregarded or called into question.[8] The transcript from the state adjudicatory proceeding indicates that the officers asked the Alwyns multiple

---

[8]The record belies the Alwyns' contention that they could not adequately explain the inconsistency because they were precluded by New Hampshire state law, see N.H. R.S.A. § 168-C:25, from making reference to the state court neglect proceedings, which were under seal. The state court record had been released to the parties, pursuant to an order by the U.S. District Court, prior to the district court's ruling. The Alwyns had the ability to supplement their opposition to the officers' motion for summary judgment with whatever information from the state court proceedings that they believed would have been helpful, but failed to do so.

times what they were hiding and why they would not let the police conduct a search of the apartment for the missing children.  The district court's determination that a reasonable person would have understood Michael Alwyn's statement, "I don't care, go in the apartment," as  his relenting to the repeated request of the police officers to enter the home to search for the children was appropriate.  Accordingly, the district court properly granted the officers' motion for summary judgment.

## IV.

Having found no error in the proceedings below, the decision of the district court is hereby affirmed.

**Affirmed.**